428 So.2d 576 (1983)
Robert C. GILLIARD, Jr.
v.
STATE of Mississippi.
No. 53959.
Supreme Court of Mississippi.
February 16, 1983.
*577 J. Ronald Parrish, Laurel, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROY NOBLE LEE, Justice, for the Court:
Robert C. Gilliard, Jr. and Edwin Darby were jointly indicted in the Circuit Court of Jones County, for capital murder. A severance was granted, Gilliard entered a plea of guilty to the charge, and the trial proceeded on the sentencing phase, Honorable James D. Hester, presiding. After hearing the evidence, receiving the instructions from the court, and argument of counsel, the jury found Gilliard guilty and sentenced him to death. He has appealed and assigns eleven (11) errors in the trial below.

FACTS
The evidence for the State shows that on August 27, 1981, Gilliard, age thirty-seven (37) years, lived with one Tressie Jones in Heidelberg, Mississippi. On that date, they attended a party and met Warren Seals and Edwin Darby. They were drinking intoxicating liquor and the group decided to rob some business in Laurel. They drove to two establishments there, but several customers were in each place and they passed them up. Eventually, they drove to the Best Chance Package Store on Ellisville Boulevard, where Gilliard and Darby got out of the car, leaving Seals and Tressie Jones inside.
*578 Gilliard was armed with a .25-caliber automatic pistol and Darby had a sawed-off shotgun. Gilliard exchanged the.25-automatic to Darby for the shotgun before leaving the automobile. They entered the store and saw the proprietor, Grady Chance, sitting in a chair facing the entrance to the store. Mrs. Wilma Chance, his wife, was sitting on a stool behind the counter and was talking on the telephone. Darby grabbed the telephone from her hand and jerked it off the wall. The robbers then ordered Mrs. Chance to open the cash register and give them the money, which she did. Mr. Chance told them, "We don't have much money here. We went to the bank." He remained sitting in the chair and Gilliard went behind the counter in search of more money. They took approximately two hundred dollars ($200.00) from the store.
Gilliard ordered the Chances to give him the keys to their automobile, planning to take the same and drive it to a different place where Seals would pick them up. Mrs. Chance testified that her husband was still sitting in the chair and was only about two feet away from Gilliard when he shot Mr. Chance in the chest, the load causing him to spin and fall to the floor. Gilliard and Darby then left and went around the back of the store. Seals started the car, left the scene and was unable to find them. Mrs. Chance went to a nearby restaurant for help, where a nurse had heard the noise and went to the store. She found Mr. Chance lying in a pool of blood with no pulse or breathing. She attempted to resuscitate him without success. Detective Jonathan Hare of the Laurel Police Department received a call about the robbery around 8:15 p.m. and immediately went to the scene (other officers had already arrived). He photographed the body and the store and collected items of physical evidence, consisting of a spent shotgun shell and wadding.
Gilliard admitted the robbery and the shooting, but claimed that he was pointing the shotgun at Mr. Chance and did not intend to shoot him; that Mr. Chance came up from the chair, apparently fumbling in his pocket for the car keys; that he (Gilliard) went to turn and the gun fell from his shoulder; and that the butt end of it hit the counter, causing the gun to fire and the load to hit Mr. Chance in the chest.
John M. Allen, a forensic scientist with the Mississippi State Crime Lab, performed tests on the shotgun trying to make it fire accidentally. It was dropped and hit with a mallet, and Allen testified that the only way he could fire the gun was by applying three (3) to five (5) pounds of pressure on the trigger. Dr. Sergio Gonzalez, pathologist who performed an autopsy on Mr. Chance, stated that, in his opinion, based on the angle of the wound, the victim was in a sitting position at the time the shot hit him. A certified copy of a previous conviction was introduced into evidence, which indicated Gilliard pled guilty to another armed robbery and received a sentence of thirty (30) years prior to the present trial.
Gilliard called witnesses who testified that he was one of eleven children; that he dropped out of school around age fourteen (14) to assist in supporting the family; that he was faced with hardships in growing up; and that he had a drinking problem. A psychologist testified that Gilliard is below average intelligence, but is not retarded; that he needs a structured disciplined environment; that he is easily influenced; and that he should not be released from prison.
Seals testified for the State. He was permitted to plead guilty as an accessory before the fact to the crime of armed robbery and was sentenced to ten (10) years in the custody of the Mississippi Department of Corrections.

LAW

I.
Did the lower court err in overruling appellant's motion for a change of venue?
Appellant filed a motion for change of venue because of alleged publicity through the news and television media given to the crime prior to the trial. The appellant did not comply with Mississippi Code Annotated § 99-15-35 (1972), which follows:

*579 On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper. (Emphasis added)
Appellant's motion was supported only by his affidavit, and not affidavits of two or more credible persons. In Gentry v. State, 416 So.2d 650 (Miss. 1982), a capital murder case, this Court held the requirement is essential to the validity of the motion. See also Butler v. State, 320 So.2d 786 (Miss. 1975); Fabian v. State, 267 So.2d 294 (Miss. 1972) and Wilson v. State, 234 So.2d 303 (Miss. 1970).
Even so, the court heard evidence on the motion from seven (7) witnesses, none of whom testified that appellant could not receive a fair trial in Jones County. Five of the witnesses testified that, in their opinions, appellant would receive a fair trial in the county. The trial judge reserved final decision until after voir dire examination of the jurors to determine from that examination whether or not a fair and unbiased jury could be obtained. He overruled the motion to change venue after considering the totality of the voir dire and being convinced that the jury was unbiased in the case.
We are of the opinion that the lower court did not abuse its discretion in denying the change of venue and that no error was committed. Saucier v. State, 328 So.2d 355 (Miss. 1976); Parks v. State, 267 So.2d 302 (Miss. 1972), cert. den. 411 U.S. 947, 93 S.Ct. 1923, 36 L.Ed.2d 408 (1972); Anderson v. State, 246 Miss. 821, 152 So.2d 702 (1963).

II.
Did the lower court err in failing to quash the jury panel because of the State's use of its peremptory challenges to exclude all persons of the Negro race solely on the basis of race?
After the jury panel had been challenged for cause, twelve (12) jurors were tendered to the State, which exercised seven (7) peremptory challenges. A full panel was then tendered to the defense which exercised six (6) peremptory challenges. The State used one additional challenge for a total of eight (8) peremptory challenges. After completion of the panel, the appellant requested that the record reflect all persons peremptorily excused by the State were Negroes. Later, after selection of the alternate juror, and sequestration of the jury for the night, appellant filed a motion to quash the panel on that ground. The lower court overruled the motion and the appellant now asserts it was obvious those persons were excused from the jury solely on the basis of race in violation of the Sixth and Fourteenth Amendments in allowing systematic exclusion of Negroes from the jury.
In the capital murder case of Gaines v. State, 404 So.2d 557 (Miss. 1981), the same question was presented to this Court. Relying upon Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court held that exercise of such challenges did not constitute error. See also Coleman v. State, 378 So.2d 640 (Miss. 1979).

III.
Did the lower court err in failing to excuse certain jurors for cause upon the request of appellant?
The appellant contends that several jurors on the voir dire examination indicated they were acquainted to some extent with the deceased, and that the lower court erred in failing to excuse them for cause. None of these persons actually served on the jury. Only one of them (L.M. Johnson) was discussed seriously in the brief and appellant exercised a peremptory challenge on him. As to the others, a full panel was accepted by appellant before it was necessary to call them as jurors. He exercised only six (6) peremptory challenges, and, *580 when the jury was accepted, appellant still had six (6) peremptory challenges which were not used. The trial court will not be put in error because of failure to permit a challenge for cause as long as peremptory challenges remain unused. Rush v. State, 278 So.2d 456 (Miss. 1973); Chapman v. Carlson, 240 So.2d 263 (Miss. 1970); Capler v. City of Greenville, 207 So.2d 339 (Miss. 1968), cert. den. 392 U.S. 941, 88 S.Ct. 2323, 20 L.Ed.2d 1403 (1968). Further, the lower court did not abuse its discretion in refusing to excuse those jurors for cause.

IV.
Did the lower court err in excusing certain jurors for cause at the request of the State?
Appellant's argument concerns the eligibility of one Hillery Pugh. The following are Mr. Pugh's answers to the court's preliminary voir dire:
THE COURT: All right, Mr. Pugh, did you say you were related by blood or marriage to the defendant?
MR. PUGH: Yes, sir.
THE COURT: What is that relationship?
MR. PUGH: Second-cousin of my wife.
THE COURT: He is a second-cousin to your wife?
MR. PUGH: That's right.
THE COURT: All right, I will make no decision in this case for a moment, but I will ask you at this time if you are permitted to serve in this case can you disregard that kinship and try this case as though you were not related by blood or marriage to the defendant? Can you do that?
I will have to ask you, since we don't have the microphone, to speak up rather loudly.
MR. PUGH: I imagine I could, but I would rather not.
THE COURT: You would rather not serve?
MR. PUGH: That's right.
Later, the prosecution challenged Pugh for cause, which was sustained, as indicated below:
MR. SMITH: All right, sir. Number 32, Hillery Pugh, Jr., who testified that his wife is related to the defendant, and she is a second-cousin  or that the defendant is a second-cousin to his wife and that he had rather not serve as juror.
MR. PARRISH: I recall that he said he imagined he could but would rather not, and I agree he said his wife was a second-cousin.
THE COURT: Does second-cousin fall within that prohibited degree?
MR. SMITH: That's second-cousin by marriage.
THE COURT: By marriage.
MR. PARRISH: I don't know by marriage whether it does or not.
THE COURT: Does the defendant have any objection to that juror being excused for cause by the State?
MR. PARRISH: Yes, sir, we object to that.
THE COURT: The Court will sustain your request for that juror to be excused based both on his kinship by marriage and the doubt that he expressed as to whether he could disregard that kinship.
Mississippi Code Annotated § 13-5-79 (1972) provides the following:
Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused, if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to which the evidence may conduct. Any juror shall be excluded, however, if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error. (Emphasis added)
The reported cases support the literal interpretation of the statute that, if the court *581 be of the opinion a juror cannot try the case impartially, the juror may be excluded and such exclusion shall not be assignable as error. Sullivan v. State, 155 Miss. 629, 125 So. 115 (1929); Smith v. State, 103 Miss. 356, 60 So. 330 (1912). In Sullivan, a murder case, the Court stated that a litigant does not have a vested right to a particular juror but only a right to be tried by a fair and impartial jury. We are of the opinion that the lower court did not commit error in excluding juror Pugh.

V.
Did the lower court err in admitting evidence which had no relevance to the sentencing phase of the trial and was prejudicial and inflammatory?
Appellant contends that, under Mississippi Code Annotated § 99-19-101 (Supp. 1982), during the sentencing phase, the State's proof shall be limited to a showing of the eight (8) aggravating circumstances. Coleman v. State, 378 So.2d 640 (Miss. 1979). He argues that, since appellant entered a plea of guilty to the crime, it was error to admit in evidence certain physical items and testimony because they were inflammatory and prejudicial. The State introduced evidence in an effort to show the following aggravating circumstances:
(1) The capital murder was committed while the defendant Robert C. Gilliard, Jr., was engaged in the commission of the crime or robbery.
(2) The defendant, Robert C. Gilliard, Jr., committed the capital murder for pecuniary gain.
(3) The defendant, Robert C. Gilliard, Jr., committed the capital murder in an especially heinous, atrocious, or cruel manner.
(4) The defendant, Robert C. Gilliard, Jr., was previously convicted of a felony offense involving the use or threat of violence to a person.
Appellant complains of four (4) photographs showing certain physical evidence in the store. The first photograph shows a spent shotgun shell on the floor, and the second shows the open cash register. There is nothing inflammatory about those photographs, the appellant having admitted the robbery and homicide, and there could be some relevance to the second photograph in establishing robbery as a motive for pecuniary gain.
The third photograph shows the deceased's arm and the wadding from the shotgun shell lying near his hand, while the last photograph shows the body lying on the floor near a chair. A considerable amount of blood appears in both photographs. They have some relevance in establishing the cruelty and atrocity of the crime and in showing the position and distances connected with the discharge of the gun. Admission of similar photographs has been upheld. Evans v. State, 422 So.2d 737 (Miss. 1982); Coleman v. State, 378 So.2d 640 (Miss. 1979); Irving v. State, 361 So.2d 1360 (Miss. 1978).
Appellant next complains about the admission in evidence of the shotgun used in the robbery, a scale drawing of the crime scene, which shows the layout of the store and the position of the body, a spent shotgun shell, the wadding, a vial containing shotgun pellets, and photographs of the street and exterior of the store taken from the point where the get-away car was parked. The witness John Allen performed test firings of the gun and determined that the spent shell only could have been fired from that shotgun, and that the wadding is of the type peculiar to the manufacturer of that brand of shells. They had some relevance and probative value in corroborating the witnesses. The photographs of the street and exterior of the store had probative value as to where the robbery took place and what the area appears to be. Those items of evidence were not inflammatory, nor were they prejudicial to the appellant.
Appellant finally attacks the testimony of several witnesses, who identified the physical evidence discussed above. The prosecution is entitled to present its case, even during the sentencing phase where a plea of guilty has been entered, in an orderly manner. *582 For that purpose, it is necessary to admit certain testimony and items of physical evidence so that the jury may have a clear and coherent idea of how and where the crime occurred. Evans v. State, supra.

VI.
Did the lower court err in permitting cross-examination of the appellant concerning his plea of guilty to capital murder?
Appellant's brief addresses this assignment in only two (2) paragraphs. He argues that it was error for the lower court to permit cross-examination of the appellant about his plea of guilty and with reference to his confession concerning the robbery-murder. On direct examination, appellant testified that the gun went off by accident and he unintentionally killed Mr. Chance. The lower court sustained an objection to the testimony, but did not give any corrective instructions. On cross-examination, in an attempt to refute the appellant's claim that the homicide was not intentional, the district attorney cross-examined appellant concerning his guilty plea. For the same reason, he cross-examined appellant regarding his confession and how the homicide occurred. Appellant takes the position that the cross-examination was improper impeachment. However, each side was trying to show how the homicide occurred, which was not a collateral matter, and had relevance on the issue of whether or not the homicide was especially heinous, atrocious or cruel. We are of the opinion that the cross-examination was not improper impeachment and did not constitute reversible error.

VII.
Did the lower court err in failing to inform the jury of the deal in plea negotiations between the State and the accomplice Warren Seals?
The record reflects that there is a dispute between appellant and the accomplice Warren Seals as to who was the moving force behind the robbery-murder, each accusing the other of being the instigator. In the cross-examination of Seals, he was asked whether or not the State promised him that he would not be indicted for capital murder, if he would cooperate in the trial. Seals answered in the negative, and stated that no promises were made to him. His testimony was contrary to the statement made by the district attorney in chambers in the presence of the trial judge and appellant's attorney. When the district attorney's statement was made, the following colloquy occurred between the trial judge and appellant's attorney:
THE COURT: You have not indicated and do not now request that the Court indicate any ruling on this in any way?
MR. PARRISH: Your Honor, I think  I don't think we have to do it now, but I have to consider and look into something on whether or not I need to ask the Court to instruct the jury about that. I don't know, and I may have to do that due to his testimony in order to preserve whatever he might be entitled to, but if I can look into that, I can inform you in the morning, and I presume we cannot do it this afternoon any way.
Later, during the conference on jury instructions, the appellant's attorney moved the court to inform the jury about the negotiations and the court overruled the motion with the words "in view of the manner in which the request is made." The court did indicate that it would consider an instruction, if properly submitted. (No instruction was submitted).
The appellant cites King v. State, 363 So.2d 269 (Miss. 1978), a murder prosecution, where several persons had plotted together with the defendant to kill the defendant's husband. Prior to trial, one of the co-conspirators was granted immunity with the concurrence of the trial court and, during trial, that witness implicated the defendant. When specifically asked about it, the witness denied knowledge of any deal. The trial court was aware that the witness had been granted immunity, but throughout the proceedings denied the defense motion to require disclosure of this type of information. *583 The court overruled the motion on the ground that such facts were more properly subject to cross-examination. The jury deliberated with the belief that the prosecuting witness was still subject to prosecution when in fact he was under grant of immunity. This Court reversed the conviction.
King cited Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), where, during the trial, the star witness denied that any deal had been made and, during the appeal, the defense discovered the promise which had been made by the first prosecutor. The United States Supreme Court reversed the conviction because the witness's credibility was "an important issue in the case, and evidence of any understanding or agreement as to future prosecution would be relevant to his credibility and the jury was entitled to know of it."
King and Giglio are distinguished from the present case in that Seals was not granted complete immunity, but was only told that the death penalty would not be sought against him. The prosecution subsequently recommended a sentence of ten (10) years. Furthermore, King and Giglio were cases involving adjudications of guilt while the case sub judice involves a sentencing hearing, where the appellant admitted his participation in the robbery-homicide, and had pled guilty to capital murder. Further, during closing argument, the district attorney expressly told the jury he had made an agreement with Seals in order to secure Gilliard's conviction and to show that Gilliard was the one who fired the gun.
Refusal to grant the instruction, which was not submitted by the appellant, is not reversible error. See Newell v. State, 308 So.2d 71 (Miss. 1975).

VIII.
Did the lower court err in failing to declare a mistrial after the district attorney made certain prejudicial remarks in his closing argument, viz, that imposing a life sentence would only be ten (10) years, at which time the defendant would be eligible for parole?
The appellant contends that remarks of the district attorney during closing argument were inflammatory, prejudicial, and constituted reversible error. The State counters with the argument that the appellant opened the matter in his closing argument and invited the response and argument made by the district attorney. Pertinent parts of both arguments follow:
BY MR. PARRISH:
I would like to mention one other thing to you at this point. Approximately two weeks prior to this he was convicted of another armed robbery here in town, and he plead guilty to that too, and he received a sentence of thirty years, and if you see fit to give him life, he will be serving thirty years, plus life.
* * * * * *
He doesn't need to be out, and the only thing that I can say is that Robert Gilliard ought to be in the state penitentiary. He is already going there for thirty years, and what you are to decide is whether or not he is going to get those thirty years, plus life, or, if at sometime before those thirty years, he is going to be executed.
* * * * * *
I don't believe he will ever be a danger to anyone again. I don't mean he wouldn't be a danger if we let him walk out on the street because he would probably start drinking again and fall in with other people like Warren Seals, but that's not where he is going, if you come back into the courtroom and inflict a sentence of life imprisonment. We can remove him from society without inflicting the death penalty in this case.
I am glad to know that in addition to a life sentence that he will have thirty years too, because he won't be around, and the only question is whether or not he ought to suffer death.
BY MR. SMITH (District Attorney):
Speaking of how long things go  about the penitentiary. I think  don't believe for a second that Mr. Parrish is telling *584 you that, "well, he will get life," and then I guess he is wanting you to believe that after he dies they are going to keep him up there thirty more years. It doesn't work like that about how long you are at the penitentiary, and he knows as well as I do, life is ten years and you are eligible then for parole.
Appellant objected to the argument of the district attorney as being improper and prejudicial. The lower court overruled the objection "in view of the argument made by the defense counsel."
In Evans v. State, supra, defense counsel compared the sentence of a codefendant with the death penalty sought for Evans in an attempt to show an unfairness by the disparity in the sentences. The prosecution responded in final argument saying that a light sentence "was only the jury sentence," implying that possible release or parole would be granted. The court declined to hold the remarks reversible error on the ground that they were provoked. Smith v. State, 220 So.2d 313 (Miss. 1969), involved reversal of a murder conviction, because the prosecuting attorney said, "If found insane, he will be released when he recovers." Gambrell v. State, 238 Miss. 892, 120 So.2d 758 (1960), reversed a murder conviction when the jury was instructed that, if the defendant was found insane, he would be released upon recovery. In Augustine v. State, 201 Miss. 277, 28 So.2d 243 (1946), a reversal was entered where the prosecuting attorney made the following remarks in closing argument:
The diligent district attorney, in his closing argument to the jury, said: "That he had seen or known of one man who had been tried for five different murders because the jurors followed the course of least resistance, and turned him loose on the others; that he had seen people go to the penitentiary for five or six year terms, then come out to commit other crimes, and that unless a stern verdict was rendered in this case it would not stop crime, and that people who were sent to the penitentiary were given a pardon or suspension." [201 Miss. at 286, 28 So.2d at 244].
The statement by the district attorney constituted error. Prosecuting attorneys often become overzealous in arguing capital cases, particularly when attorneys for the defendant attempt to overemphasize and exaggerate the real meaning of a life sentence in the penitentiary. Prosecuting attorneys should refrain from making prejudicial or erroneous remarks, even in response to argument of defense counsel. In the present case, the remarks of the appellant's attorney clearly and obviously were made for the purpose of leading the jury to think that, because of a thirty-year armed robbery sentence and with a life sentence in the present case, the appellant would spend the remainder of his life in the state penitentiary. Without question, those remarks amounted to provocation and caused the district attorney to respond as he did. Therefore, under the decisions of this Court, the error does not require reversal.

IX.
Did the lower court err in refusing jury Instructions D-2, D-4, D-6, D-7, D-9, D-10, D-11 and D-12?
Instruction D-2 follows:
The Court instructs the jury that should you be unable to unanimously agree on a verdict the Court will sentence the Defendant to life imprisonment.
Yates v. State, 253 Miss. 424, 175 So.2d 617 (1965), cited by appellant, is not authority for his position that refusal of Instruction D-2 constitutes error. In Yates, the death penalty was imposed by the jury. The instruction simply set forth the form of a verdict telling the jury that it could return any one of three verdicts (1) determining the penalty of the defendant and fix his punishment at death, (2) fixing his punishment as life in the penitentiary, and (3) certifying that they are unable to agree upon his punishment, in which event it would be the court's duty to sentence him to life imprisonment. The instruction was granted and the case was affirmed.
*585 Instruction S-B told the jury that to inflict the death penalty the verdict must be unanimous. Instruction S-A told the jury that it must unanimously find beyond a reasonable doubt one or more of the aggravating circumstances existed in order to return the death penalty; that, if none of those elements were found to exist, the death penalty could not be imposed; and that the jury should return a verdict sentencing the appellant to life imprisonment. Instruction C-20 told the jury that it must unanimously find the aggravating circumstances outweighed the mitigating circumstances in order to return the death penalty. The instruction further told the jury that it must return one of three verdicts, to-wit: (1) verdict imposing the death penalty, (2) verdict sentencing appellant to life imprisonment, and (3) the jury was unable to unanimously agree on punishment.
Refusal of Instruction D-2 was not error.
Instruction D-4 follows:
The Court instructs the jury that in considering mitigating circumstances you shall consider whether or not the Defendant would pose a danger to others or to society should he be sentenced to life imprisonment rather than death.
While the jury may consider any circumstances that the jury may think to be mitigating, whether from one to one thousand, the court is not required to specifically point out and emphasize all possible mitigating circumstances. It is sufficient, if the court by instruction informs the jury it can consider any mitigating circumstance and then leave for the jury the determination of what may, or may not, be mitigating. The jury was adequately instructed in this area by Instruction C-20, telling it to consider
(6) Any other matter, circumstance or combination of circumstances, or any other aspect of the defendant's character, life or record, and any other circumstance of the offense brought before you during the trial of this case which you, the jury, deem to be mitigating on behalf of the defendant.
Instructions D-6 and D-7 follow:
JURY INSTRUCTION NUMBER D-6
The Court instructs the jury that if you find that the aggravating circumstances outweigh the mitigating circumstances in this case, you are sill not bound to sentence the Defendant to death, but may sentence him to life imprisonment.
JURY INSTRUCTION NUMBER D-7
The Court instructs the jury that even if you should find that insufficient mitigating circumstances exist in this case to outweigh the aggravating circumstances, you are not required to impose the death penalty, but, you may sentence the Defendant to life imprisonment.
Again, Instruction C-20 told the jury that, before it could return the death penalty, it must unanimously find that the aggravating circumstances outweigh the mitigating circumstances and that it must unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances exist in order to return the death penalty. If none existed, the death penalty may not be imposed and the jury should return a sentence of life imprisonment. Also, Instruction D-8 (granted) told the jury that one who is guilty of capital murder does not automatically receive the death sentence, and that the jury could not inflict the death penalty unless it found that, beyond all reasonable doubt, the aggravating circumstances, if any, outweigh the mitigating circumstances, if any.
Appellant complains that the lower court erred in refusing Instruction D-9, which sought to include as an element of mitigation the fact that "appellant acted under the substantial domination of another person." What appellant seeks to specifically emphasize is generally covered in Instruction C-20 which listed the following as a possible mitigating factor:
(4) Any favorable traits in the character of the accused, and any compensating or mitigating factors in his life history and behavior, and any factors which were *586 beyond the control of the defendant in his life history, rearing, and upbringing which may have caused him to be involved in this crime and which were beyond his influence or control.
Appellant assigns Instructions D-11 and D-12 as being erroneously refused. They follow:
D-11
The Court instructs the jury that if the defendant, Robert Claude Gilliard, Jr., is sentenced to life imprisonment he will be confined to maximum security.
JURY INSTRUCTION NUMBER D-12
The Court instructs the jury that even if you find that there are a larger number of aggravating circumstances, then you still may not return the death penalty if they are overcome by mitigating circumstances, even though there may not be as large a number of mitigating circumstances.
The appellant does not argue or brief that assignment. There was no error in refusing those instructions. No. D-11 was not relevant to the sentence, and Instruction C-20 and others granted adequately cover the sense of D-12.

X.
Did the lower court err in granting Instruction C-20? The instruction included two aggravating factors: (1) that capital murder was committed while defendant ... was engaged in the commission of the crime of robbery, and (2) that the defendant ... committed the capital murder for pecuniary gain. Appellant contends that it was reversible error to include both factors, since they duplicate and because murder for pecuniary gain was intended to apply to hired killers. The case of Smith v. State, 419 So.2d 563 (Miss. 1982), involved this very question, and held that the instruction was not error, citing Voyles v. State, 362 So.2d 1236 (Miss. 1978) and Bell v. State, 360 So.2d 1206 (Miss. 1978).
Appellant also argues that the instruction was error because it listed as an aggravating circumstance that "the crime was committed in an especially heinous, atrocious or cruel manner." He relies upon decisions of the Florida Supreme Court which hold that the words "especially heinous, atrociously or cruel" must be construed to be something more than the normal taking of a human life, and that intentional acts involving torture to the victim or other cruelties are required to set the death penalty apart from normal capital felonies. Courts have held that such a sentencing guideline given to the jury must provide a meaningful basis for distinguishing the few cases in which capital punishment is imposed from the many cases in which it is not. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Jordan v. Watkins, 681 F.2d 1067 (5th Cir.1982).
Under the facts of the case sub judice, we are of the opinion that the question of whether or not the murder was especially atrocious, heinous or cruel was properly submitted to the jury. Evans v. State, supra.
In Dobbert v. Florida, 375 So.2d 1069 (Fla. 1979), cert. den. 447 U.S. 912, 100 S.Ct. 3000, 64 L.Ed.2d 862, reh. den. 448 U.S. 916, 101 S.Ct. 37, 65 L.Ed.2d 1179 (1980), the Florida Supreme Court held that even though the lower court considered two circumstances which would not pass constitutional muster and did not amount to aggravating circumstances, there was one aggravating circumstance which existed and that it was sufficient to uphold the death penalty. The only distinction between Dobbert and the present case is that in Dobbert, under Florida law, the judge determined the sentence without a jury.

APPELLATE REVIEW OF SENTENCE
The appellant assigns as Error XI, that the lower court erred in refusing to impose a sentence of life imprisonment at the conclusion of all the evidence presented, or, in the alternative, that the lower court erred in failing to grant appellant's motion for vacation of the death penalty and imposition of a life sentence.
*587 In accordance with Mississippi Code Annotated § 99-19-105(3)(a), (b), (c) and (5) (Supp. 1982), and the decisions of this Court and the Federal courts on imposition of the death penalty, we have carefully reviewed the record in this case and have compared it and the death sentence imposed in the cases which have been decided by this Court since Jackson v. State, 337 So.2d 1242 (Miss. 1976). Those cases consist of fifteen (15) decisions by this Court from Bell v. State, 360 So.2d 1206 (Miss. 1978) to King v. State, 421 So.2d 1009 (Miss. 1982).[1] In Coleman v. State, 378 So.2d 640 (Miss. 1979), the case was reversed as to punishment and remanded for resentencing to life imprisonment.
In our opinion, after such review and comparison, the punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other and the death penalty will not be wantonly or freakishly imposed here.
We also find and conclude that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor. The evidence in the case overwhelmingly support's the jury's finding of at least one statutory aggravating circumstance, viz: (1) the capital offense was committed by appellant while he was engaged in the commission of the crime of robbery; (2) the capital offense was committed for pecuniary gain; (3) the capital offense was committed in an especially heinous, atrocious, or cruel manner; and (4) the appellant was previously convicted of a felony offense involving the use or threat of violence to a person.
After comparison of the present case to those enumerated herein, we find that the sentence of death is not excessive or disproportionate to the penalty imposed in those cases, considering both the crime and the manner in which it was committed and the defendant. We also are of the opinion that the death penalty imposed on Gilliard is consisten and even-handed to like and similar cases and the sentencing phase followed in this trial provided a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not imposed.[2]
The judgment of the lower court is affirmed, and Wednesday, March 23, 1983, is set for the date of execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED. WEDNESDAY, MARCH 23, 1983, SET FOR EXECUTION OF THE DEATH PENALTY.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and BOWLING, DAN M. LEE, and PRATHER, JJ., concur.
HAWKINS and ROBERTSON, JJ., took no part.
NOTES
[1] A list of the cases is attached as Appendix A to King v. State. Since King, Evans v. State, 422 So.2d 737 (Miss. 1982) was decided November 3, 1982.
[2] Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).