ROY NOBLE LEE, Presiding Justice, for the court:
Terry Lester Baker and Anita Baker, husband and wife, were jointly indicted and tried in the Circuit Court of Harrison County, Honorable J. Ruble Griffin, presiding, for the murder of Christopher Darden Baker, five-week-old child of the Bakers. Terry Lester Baker was found guilty of manslaughter, and the jury was unable to agree as to Joyce Baker’s guilt. The lower court sentenced Baker to seventeen (17) years in custody of the Mississippi Department of Corrections.
Baker has appealed to this Court and assigns four (4) errors in the trial below. The first three assignments of error present the same question, viz, the death of Christopher Darden Baker was excusable under Mississippi Code Annotated § 97-3-17(a) (1972), was not the result of culpable negligence which would support a conviction of manslaughter, and the verdict of the jury was against the overwhelming weight of the evidence.
Appellant and Anita Baker were ages 18 and 16, respectively. Christopher Darden Baker was born April 11, 1981, and died May 21, 1981, at the approximate age of five (5) weeks. Anita Baker was two months pregnant at the time of marriage.
Evidence favorable to the prosecution reflects that on the afternoon of May 20, 1981, appellant and Anita Baker went to the Outrigger Lounge in Gulfport about 5:30 p.m. They remained there until approximately 9:15 p.m., although each one left the interior of the establishment several times during that period. While at the lounge, appellant drank eight (8) cans of beer. Prior to going there, appellant had taken drugs consisting of a “Black Molly” and a “pink football.”
Later in the evening and night, after the Bakers had returned home, according to *772 appellant, he was bouncing baby Christopher on the bed and tossed him in the air, then fed the child and put him to bed. The child stopped breathing, and appellant attempted to resuscitate him without success. The Mobile Medic unit was called, the medics were unable to detect that the child was breathing, they administered emergency respiration, and transported him to the emergency room at Gulfport Memorial Hospital.
Dr. Ronald T. Bruni was called to examine and treat the child and was able to revive the child's breathing with the aid of a resuscitator. The child improved to a slight extent, but expired at 4 a.m. Dr. Bruni testified that he saw the child about 1:45 a.m. on May 21, 1981; that the child was not able to maintain normal breathing on his own; that he was pale, had multiple bruises around the eyes and a large bruise across the left forehead; that the child was not making any movements, and had a very gray pulse that was weak and rapid; that the blood pressure was practically undetectable, and the child was in shock; that plasmonate was given to bring the child out of shock; that the respirator was adjusted and it became obvious there was something wrong with his head, which felt like a water balloon; and that he suspected the baby had sustained damage to the skull. There was swelling of the child’s brain and steps were taken, including various types of medication, to reduce the brain swelling. Blood tests revealed that the child had suffered considerable blood loss. He had stabilized some, still remained in shock, and all efforts failed to prevent him from expiring.
Dr. Bruni determined that there were skull fractures and old rib fractures, from X-rays which were taken, and he talked with appellant to ascertain a history of the injuries. Appellant volunteered that the child had struck his head on the steering wheel of their car about a week prior to being seen in the emergency room and denied that the child had lost consciousness, or had a bruise after receiving the blow. Appellant further related that he was told the child probably sustained broken ribs during the Ceasarian birth of the child. Dr. Bruni found four (4) fractured ribs and stated that, in his experience as a pediatrician, he had never seen a situation where a baby incurred four broken ribs in a section delivery. According to the doctor, he found that the entire gastro-intestinal tract of the baby showed it to be completely empty, which indicated that the baby had no food going into the gastro-intestinal tract for at least two (2) days. In his opinion, bruises on the child were received within the past twenty-four (24) hours.
The doctor testified that the child never breathed on his own; that his pupils were fixed and dilated at mid-point, meaning that there was severe damage to the brain which made it impossible for the eyes to react to light. Dr. Bruni’s final diagnosis was:
Q. Doctor, I’ll ask you to look at page 2 of your summary. Doctor, do you find that? Page 2?
A. Yes, sir.
Q. You see where it says final diagnosis?
A. Yes, sir.
Q. You have three possible reasons?
A. Yes, sir.
Q. Would you read those to me, please, doctor? Those are your determinations and your findings?
A. Yes.
Q. Would you read those for me, doctor, please?
A. It says, “Final Diagnosis, number one — multiple skull fractures with inter-cerebral bleedings; number two — possible battered child syndrome; number three — several old fractures of right rib cage.
Q. The baby never had a chance when it was brought to the Emergency Room, did it, doctor? Tell me. To survive.
A. Well, it’s probably correct.
Dr. Edward Matthew Rehak, a pathologist, performed an autopsy on the baby May 22, 1981. In brief, he found a large amount of fresh blood and clotted blood immediately below the scalp. There were multiple bone fractures of the top portion *773 of the skull. Some were fractured, others were depressed, pushing down into the brain. He found massive hemorrhage in the brain cavity, both subdural and sub-arachnoid. The hemorrhage covered the cerebral cortex, cerebellum, and the spinal cord extending down. He found four (4) fractured ribs on the right side of the thorax encompassing ribs 4, 5, 6 and 7, and that the gastrointestinal tract was completely empty showing no evidence of any food, which was unusual. Microscopic study indicated that the rib fractures were probably between two and three weeks old and, in the doctor’s opinion, could not have been as old as five weeks. He attributed the cause of death to massive hemorrhage in the scalp and the subdural and subarach-noid space with multiple skull fractures and depressed skull fracture. In his opinion, the skull injuries resulted from blunt trauma.
Appellant took the stand in his own behalf at the trial. On cross-examination, he testified to the following:
Q. You took this five week old baby that you’d just dropped, you picked him up, he was crying, gave him a bottle, he took a little of it, you changed his diaper, and then put him in the bed?
A. (No response.)
Q. That what you’re saying?
A. Yes.
Q. And he went on to sleep?
A. Yes, sir.
Q. And the baby never woke up again, did he?
A. No, sir.

Q. You could have thrown him up above your head?
A. Yes, sir.
Q. How tall are you?
A. About 5’11”.
Q. And the bed was what?
A. Two foot.
Q. You’re 5’11”, and the baby was going up above your head? So, the baby had to fall roughly three and a half to four feet to the bed, and then another, at least six feet to the floor from where you [were] throwing him? Isn’t that true?
A. No, sir. I broke the fall. I tried to catch him.
Q. You broke the fall?
A. Some of it.
Q. But he did fall approximately six feet from where he started down from above your head, at least six feet until he finally came to rest on that tile floor?
A. Yes, sir.
Q. That’s be about six feet?
A. Yes, sir.
The appellant contends that Mississippi Code Annotated § 97-3-17(a) (1972) excuses his conduct. It states:
The killing of any human being by the act, procurement, or omission of another shall be excusable:
(a) When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent; ....
Smith v. State, 197 Miss. 802, 818-19, 20 So.2d 701 (1945), discusses culpable negligence and sets forth the following rule:[1]
Culpable negligence should be construed to mean a negligence of a higher degree than that which in civil cases is held to be gross negligence, and must be a negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and that this shall be so clearly evidenced as to place it beyond every reasonable doubt.
Under all of the evidence presented to the jury, there was an issue as to the guilt or innocence of the appellant. The lower court correctly submitted that question to the jury, and the verdict and judg *774 ment are not contrary to the overwhelming weight of the evidence.
Under Assignment IV, the appellant contends that the district attorney, in closing arguments, made prejudicial statements which biased and prejudiced the jury against him. Statements made by the appellant’s attorney and the district attorney follow:
Ladies and Gentlemen of the Jury, you pay the prosecutor with your taxes, but he’s supposed to use some discretion in the cases he brings before you as jurors. These two kids, two little kids, 16 and 18, how many of us have teenagers like that, as sitting before you, and the prosecution is asking you to convict them of murder.

It ought to shock the conscience to think that Albert Necaise would come into this courtroom to prosecute these two little kids on murder.
In response, the district attorney stated:
The grand jury meets back here and they hear the evidence. The grand jury is made up of people like you in the county. They sat right there and they heard the evidence. They heard both of their statements. They didn’t appear, but their statements were read to the grand jury. Every piece of evidence that we had, that we gave you all, every piece of it was given to the grand jury with the exception of the Dixon boy’s testimony. His testimony was not given to the grand jury. The grand jury is made up of twenty people. They didn’t decide the guilt or innocence. That is not their responsibility. Their responsibility is what charge should these people, or if they should be charged, tried, what should they be tried for? That jury said they should be tried for murder.
(Objection by appellant’s attorney overruled).
That’s what they said they ought to be tried for. His Honor comes out to try the case, put on the evidence, and His Honor says the jury has an alternative. They can bring in one of three verdicts. (R. 357-359)
In Gilliard v. State, 428 So.2d 576, 584 (Miss.1983), we said that although the remarks there made were improper, the remarks of the defense attorney were sufficient provocation to excuse the district attorney’s response. We have carefully considered the statements of the attorneys for appellant and the State and, in our opinion, the district attorney’s remarks do not constitute error.
The appellant complains about the verdict of manslaughter and the fact that the jury sent a note to the trial judge inquiring whether it could find one of the defendants guilty of involuntary manslaughter. The judge answered the question in the affirmative. We are of the opinion, that no reversible error occurred from that incident.
The judgment of the lower court is affirmed.
AFFIRMED.
WALKER, P.J., and BOWLING, HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
PATTERSON, C.J., not participating.

. The principle has been restated many times and recently in Gray v. State, 427 So.2d 1363 (Miss.1983).