## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-00915-SCT

*KENNEDY BREWER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/25/95 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TINA LOUISE HOLCOMBE |
| | RICHARD BURDINE |
| | RHONDA R. HAYES-ELLIS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| | MARVIN L. WHITE JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 7/23/98 |
| MOTION FOR REHEARING FILED: | 8/7/98 |
| MANDATE ISSUED: | 10/29/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This is an appeal from a conviction and sentence to death for the rape and murder of a three-year-old child. Because we find no error of a magnitude requiring reversal, we affirm.

**I.**

¶2. In May 1992, Gloria Jackson lived in a small community close to Brooksville, Mississippi known as Pilgrim's Rest. She resided in a six-room house that contained two bedrooms; however, she only used one of the bedrooms furnished only with a chair, a bed, a dresser and a television. The window in that bedroom was broken out when Jackson initially moved in the house in June 1991. Two doors led to the outside of the house. One door was in the living room and the other one in the kitchen.

¶3. During the spring of 1992, three of Jackson's four children lived with her in this house -- Christine who was three years old; Keithshawn who was twenty-two months old; and Nicole who was thirteen months old.[(1)] Jackson was dating the appellant, Kennedy Brewer, during this time. They had been dating for approximately three years before May 1992. Brewer would sleep at Jackson's house "every now and then." During the weekend of May 2, 1992, he came to her house Friday morning at 3:00 a.m. He stayed all day Friday, spent Friday night and was there all day Saturday as well.

¶4. On Saturday May 2, Jackson and Brewer had planned to go out together, but Brewer changed his mind. Jackson therefore decided to go out with her sister. She dressed to go out, but before she left Brewer wanted to have sex. Jackson told him to wait until she returned. When Jackson left at 8:00 or 8:30 p.m., Brewer was wearing a pair of light blue overalls, a blue shirt with a black design in it and a pair of black shoes.

¶5. As Jackson drove down the road away from her house, she met Dewayne Graham and Leshone Williams walking towards her home. The teenagers lived in houses very close to Jackson's home. She stopped and briefly talked with them. They later went to Jackson's home and spent some time with Brewer and the children. Jackson then went to her sister's house, but her sister was not home. She eventually found her sister at a friend's house, and after a number of stops, they went to a night club.

¶6. The owner of the Santa Barbara Club would not allow Jackson in the club because she and Brewer had fought there recently. Thus at 12:09 a.m., she and her sister left the club. Jackson's sister dropped Jackson off at home around 12:30 a.m. Jackson did not knock on her front door because she did not want her landlord to know that Brewer was over there.[(2)] Jackson therefore went to the bedroom, pulled back the blanket covering the broken window pane and told Brewer to open the door. He did, and she locked the door by pushing a bent nail over the door's frame.

¶7. Brewer returned to the bedroom. He was wearing a pair of Jackson's white shorts. No lights were on in the bedroom, but the television was on. As Jackson walked into the bedroom, she asked about Christine's whereabouts because she wanted to make a pallet on the floor on which the child usually slept. Brewer told her that Christine was in the bed. He then went over, picked up a form wrapped in a blanket and laid the form on the pallet. Jackson did not see a head, any arms or legs on the form that Brewer placed on the pallet. She was not paying much attention.

¶8. Brewer then went into the living room and brought back a makeshift light. He plugged the light up and placed it over the dresser. Jackson did not check on her children as she trusted Brewer with them. As Jackson undressed, she and Brewer talked while he ate a hot dog. They then had sex. Afterwards, they got up and Brewer drank his beer as Jackson drank a Champale. Jackson was "a little high." She told Brewer that she was going into another room to douche. He told her to wait until morning, but she refused. According to Jackson, Brewer did not want her to get out of the bed. She nevertheless went into the next room and douched without any source of light. Brewer came into the room and "stood over" her while she washed.

¶9. Once in bed, Jackson laid down on the outside. Her twenty-two-month-old toddler was sleeping next to the wall, and the youngest child was at the foot of the bed. Brewer was in the middle of Jackson and the twenty-two-month-old baby. Brewer told Jackson he wanted to sleep on the outside. She refused to move.

¶10. The next morning Jackson woke up around 7:00 a.m. due to Brewer's attempts to initiate sex. She told him to stop and the youngest child began to cry. Jackson asked Brewer to fix a bottle for the baby. He left the bed and went into the kitchen. He returned with the bottle and got back in bed. By this time, Jackson noticed that the baby was "soaking wet." She again asked Brewer to pass her a Pamper. He obliged. During the two times he got up from the bed, he did not mention anything about Christine.

¶11. Brewer began to question Jackson about her car -- how long Jackson's sister would have her car. Jackson told him that she would have to call her sister. She recalled that Brewer had also asked about the car when she returned home earlier that morning. Jackson left the bed at 7:30 a.m. It was daylight at this time, just as it had been light outside when Brewer left the bed to get a bottle and Pamper. Immediately upon leaving the bed, Jackson noticed that Christine was not on the pallet. She asked Brewer about Christine's whereabouts. He replied, "I don't know." She looked in the other room, but the child was not there. Brewer was showing "no concern at all." Jackson then went outside -- unlocking the door first -- and asked her neighbor if Christine was over there. She was not.

¶12. Shortly after that, some of Jackson's neighbors came over and helped searched for the missing child. During this time, Brewer "was just standing in the room." The search moved to the outside of the house; however, all of the windows and doors in the house were locked and the child would have been unable to open any of the windows or doors by herself. Jackson called the police. She and Brewer were taken to jail that day. Jackson was eventually charged with accessory to murder after the fact, but the charges were dropped. She remained in jail for seven months. While in jail, Jackson and nearby Brewer talked. On one occasion -- the first day they were taken into custody -- Jackson took off her shoe, hit Brewer in the face with it and asked him what had he done to her daughter. About a week after their arrest, Jackson screamed from her cell to Brewer that when he went to prison other inmates were going to do him the way he did her baby. Brewer replied, "It need to been you dat [I] kilt."[(3)]

¶13. Brewer was indicted for Christine's murder on September 15, 1992. The indictment alleged that he murdered Christine while engaged in the crime of sexual battery. At his trial, Jackson testified to the preceding account of events. Additionally, she testified that she did not notice any blood on Brewer's crotch area, nor on herself after having sex with him. As far as she could recall, Brewer did not leave the bed after they went to sleep. The blanket Jackson found on the floor at 7:30 a.m. Sunday morning was the same blanket that Jackson observed Brewer place on the floor earlier that morning, except at 7:30 a.m. the blanket was spread out. She did not notice any blood on the blanket. She did not look for any. According to Jackson, Brewer was not acting nervous when she arrived home at 12:30 a.m., but he was later that day.

¶14. Dewayne Graham testified for the State. He lived very close to Jackson in Pilgrim's Rest. He had known Brewer for a couple of years, and he is Jackson's first cousin. On May 3, 1992 around 8:00 or 8:30 p.m., Graham and his friend, Leshone Williams, were walking toward their homes when they ran into Jackson. After talking to her for a few minutes, they went to their grandmother's house where they stayed for about five or ten minutes. They then went to Jackson's house and visited with Brewer for about twenty minutes, after which they returned to their homes to do chores. After finishing their chores, the teenagers returned to Jackson's house and hung out with Brewer. Brewer was then wearing a pair of white shorts. They watched television in the bedroom. All of the children were in

the bed. Christine was sleeping at the foot of the bed. Graham and Williams stayed at Jackson's home until about 11:50 p.m. The teenagers were certain it was close to midnight when they left because "Soul Train" was coming on as they arrived at their own homes.

¶15. Leshone Williams' testimony was consistent with that of Graham. The only addition was that when they returned to Jackson's home the second time, all of the children were alive because they were playing upon their arrival. The children fell asleep about five minutes after Williams and Graham came into the bedroom.

¶16. Jackson's landlord, R. Bell Williams, testified that after Jackson called the police Jackson said something to Brewer and he responded, "Didn't I tell you I laid that damn gal on that pallet." Bell Williams did not see Brewer go down to the creek that morning when people began to search for the child.

¶17. Bud Permenter, a deputy sheriff with the Noxubee County Sheriff's Department, arrived on the scene at about 9:30 a.m. Upon his arrival, there were approximately forty to sixty people at the house. Some people were searching for the missing child, and some were just standing around. After being there for about fifteen or twenty minutes, Sheriff Permenter saw Brewer standing in the front yard. Permenter talked to Jackson before going into the house and investigating the interior. He found the kitchen door and all of the windows locked. He searched the loft, outside the house, under the house and around the broken window for footprints or any suspicious evidence. He found nothing. There was no evidence of forced entry into the house, and there was no way that someone could have climbed through the broken window as he found it.

¶18. As Permenter conducted his investigation of the house and the surrounding area, he could hear Jackson shouting in the yard, asking Brewer what had he done with her child. The crowd, in turn, was becoming upset with both Jackson and Brewer regarding the missing child. To prevent an altercation, Permenter placed Jackson and Brewer in his car for safety. Shortly thereafter, Sheriff Walker came and took them to jail while Permenter continued his investigation of the scene.

¶19. The following day Permenter and others again searched the area for the missing child. Their search was fruitless. On May 5, 1992, the search resumed, this time aided by a dog team from Newton County. Permenter had obtained Brewer's clothes from jail after taking him to the hospital to have a rape kit completed. These clothes were given to the dog handler to pick up Brewer's scent. The dog team was made up of three dogs. The first dog, Judy, sniffed Brewer's clothes and carried the handler around the north side of the house where the hog pen was located. The dog had picked up Brewer's trail, but she became frightened when a big hog came along. As such, Judy was retired and Jim was chosen to sniff out Brewer's scent. Jim led the dog handler to the edge of the creek behind Jackson's house.

¶20. Later that morning with the assistance of a helicopter, Christine's body was found in the creek behind Jackson's house. The child's body was found near the location the dog Jim had previously indicated. Right across from where the child's body was found, a smeared footprint was seen on the creek's edge.

¶21. Ernest Eichelberger, the chief investigator with the Noxubee County Sheriff's Department, became involved in this case on May 4, 1992. He conducted a preliminary investigation of the crime

scene, but found no evidence of forced entry, blood or hair. During his follow-up investigation on May 5, he discovered a break in the vegetation around the creek. This break was located north of Jackson's house, over toward where a bridge crosses the creek.

¶22. John Easom was the volunteer canine officer whose dogs were used in this case. He testified that after the second dog, Jim, picked up Brewer's scent and followed it into the bush lining the creek that his third dog Jessie was given an article of clothing containing the child's scent. Jessie went to a big pool of water near the creek and began pawing the water and putting her head in the water. They did not see anything in the water at that time. He did notice, however, an opening or break in the vegetation on the opposite side of the pool of water in an area just a little north of where the body was ultimately found.

¶23. The State's case-in-chief also included testimony from Lori Aria, a forensic scientist specializing in serology and hair comparison analysis. She found hair in the pocket of Brewer's overalls; however she was unable to match this hair with Brewer or Christine. Hair fragments were also recovered from the underwear and clothing of the three-year-old victim; however, these fragments were too small to compare. There was a blood stain in the right front pocket of Brewer's overalls. Brewer's blood type was O, and the child had type A blood. The blood in the overalls was type O blood. There was a blood stain on Brewer's blue shirt, right above the pockets. Aria was unable to detect an ABO blood type from this sample however. Also, there was blood found on the short pants that Christine was wearing and the blanket that was on the pallet. Aria determined that the blood on the blanket was human blood, but she was unable to determine a blood type. She was also unable to determine the blood group type from the blood stain on the little girl's pants.

¶24. Semen was detected on the child's vaginal slide. No conclusions could be drawn from this semen, however, because there were only five spermatozoa. Semen was also detected on the front of Brewer's underwear. A little girl's dress was submitted to the crime lab for analysis. Aria found a substance which she determined was "possible fecal material" in her report.

¶25. Aria was allowed to testify before the jury that, based upon her visual, smell, microscopic and amylase tests, the substance was fecal material. The fecal matter was located on the front left shoulder and down the front area of the dress -- not in the back of the dress, which would have been consistent with the child having soiled the garment.

¶26. The State also presented the testimony of Dr. Steven Hayne, a physician who qualified in the trial as an expert in forensic pathology. Dr. Hayne examined the body of Christine Jackson on May 09, 1992. An external exam of the child's head revealed non-circumferential abrasions and scrapes to the skin of the neck. Dr. Hayne opined the marks represented the application of force on the child's neck while she was alive. There were similar abrasions on her arms, forearms and hands. Some of them were defensive posturing injuries. In Dr. Hayne's opinion, three-year-old Christine was "thrashing and fighting" as best she could for her life.

¶27. An internal examination of the child's body showed that she did not die of fresh water drowning. Instead, Dr. Haynes opined that she died of manual strangulation by hand. An examination of her vaginal area revealed one-half inch contusions on the top, bottom, right and left sides of the vaginal vault. There was a one centimeter contusion on the labia menorrhea, and there was a laceration extending from the vaginal vault to the rectum and anus, forming one large tract. In short, the child

had been brutally raped in such a way that her vaginal vault was ripped open all the way to her anal opening. The injuries were consistent with those caused by the forceful penetration of a male penis. There would not have been a large amount of bleeding from the child's vagina due to the extent of the bruising he found, which indicated that death occurred shortly after the injury was sustained.

¶28. Dr. Hayne also found wound patterns on the child's body which resembled bite marks. He did not believe these wound patterns were from decomposition, slippage or insect bites. As such, he asked Dr. Michael West to evaluate the child's body.

¶29. Dr. West, a general dentist practicing in Hattiesburg, Mississippi was the State's expert forensic odontologist. He testified that he examined the three-year-old child's body on May 5, 1992. On May 8, 1992, Brewer, Gloria Jackson (the victim's mother), Dewayne Graham and Leshone Williams were brought to West's office so that he could obtain dental impressions from them. On May 9 West returned to the morgue to compare the above-named individuals' dental models to the bite mark patterns on the child's body. In looking at the child's body, Dr. West saw three or four marks that he immediately identified as bite marks. There were nineteen bite marks on the child's body. Out of nineteen, five of them were "very good." The other fourteen bite marks were fair to average to poor.[4]

¶30. When West performed the direct comparison test, none of the dental impressions from the individuals matched the wounds on the three-year-old's body except Brewer's. Dr. West evaluated Brewer's teeth to detect any individualizing characteristics in his impression that matched patterns in the bite mark. The doctor discovered that one of Brewer's front teeth had a chip in it and that his upper teeth were much sharper than his lower teeth. In addition, there was a gap between his front teeth. To a reasonable medical certainty, Dr. West opined that Brewer's teeth inflicted the five bite mark patterns found on the body of Christine Jackson. The doctor further concluded that it was "highly consistent and probable" that the other fourteen bite mark patterns were also inflicted by Brewer.

¶31. The State rested its case-in-chief following Dr. West's testimony. The defense moved for a directed verdict, asserting that the State failed to make out a prima facie case of the offense charged. The trial court overruled the motion.

¶32. The defense presented the testimony of Dr. Souviron, a licensed dentist who was a founding member of the ABFO. Dr. Souviron opined that none of the wounds on the child's body were bite marks. This was his opinion because there were no corresponding lower teeth prints found on the child's body. Dr. West explained that, for some unknown reason, Brewer's lower teeth were not very sharp.

¶33. On cross-examination, it was determined that Souviron had no problem with the direct comparison technique used by West in this case. In fact, he admitted to using the same technique in past bite mark cases.

¶34. The defense also called Brewer's brother, Charlie, as a witness. He testified that on May 3, 1992 he went to visit his mother where he was informed by a niece that Christine was missing. He then went to Jackson's home where he and Brewer purportedly searched for Christine together. According to Charlie, he and Brewer walked right to the edge of the creek behind Jackson's home in their search

for the child.

¶35. In rebuttal, the State presented the testimony of Officer Eichelberger, chief investigator of the Noxubee County Sheriff's Department. Eichelberger told the jury that during his investigation of this case, he took a statement from Charlie Brewer and that, in this statement, Charlie never said anything about going to the creek with Brewer on the morning of May 3, 1992 to search for Christine. In fact, Eichelberger specifically asked Charlie when had he last seen Brewer, and Charlie replied, "The Wednesday before he was arrested." Brewer was taken into custody on a Sunday, May 3. Charlie's statement was taken on May 11, 1992.

¶36. Based upon the preceding evidence, the jury found that Brewer committed the offense of capital murder while engaged in the commission of the crime of sexual battery. The jury heard evidence in the penalty phase the next day and sentenced Brewer to death by lethal injection.

¶37. On May 9, 1995, Brewer filed a motion for judgment notwithstanding the verdict, or alternatively, for a new trial, which raised fifteen assignments of error. The motion was overruled on August 21, 1995. Aggrieved, Brewer appeals to this Court for relief.

## II.

## CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL

¶38. In his first assignment of error, Brewer argues that his right to a speedy trial under the federal and state constitutions was violated in light of a delay of approximately 1,051 days from the date of arrest to the commencement of trial. Brewer was arrested on May 3, 1992. Trial began on March 20, 1995.

¶39. The right to a speedy trial attaches at the "'time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge.'" *Perry v. State*, 637 So. 2d 871, 874 (Miss. 1994) (quoting *Lightsey v. State*, 493 So. 2d 375, 378 (Miss. 1986); *see also Vickery v. State*, 535 So. 2d 1371, 1376 (Miss. 1988). In *Smith v. State*, 550 So. 2d 406 (Miss. 1989), this Court held that for constitutional purposes the right to a speedy trial attaches at arrest. *Id.* at 408. "'Once the constitutional right to a speedy trial has attached, this Court examines the facts of the case and engages in a functional analysis of those facts in accordance with *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether the constitutional right to a speedy trial has been denied.'" *Perry*, 637 So. 2d at 874 (quoting *Handley v. State*, 574 So. 2d 671, 674 (Miss. 1990)).

¶40. Under *Barker*, the factors to be weighed and balanced in light of the facts of each case include (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice resulting to the defendant [because of the delay. *Barker*, 407 U.S. at 530. In *Jaco v. State*, 574 So. 2d 625, 630 (Miss. 1990), this Court noted that "No one factor is dispositive."

¶41. If the delay complained about is not presumptively prejudicial, the analysis goes no further. *Jaco*, 574 So. 2d at 630. An eight-month delay was held to be presumptively prejudicial by this Court in *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989). Although the length of the delay may be

presumptively prejudicial, the other factors must still be considered. *Perry*, 637 So. 2d at 874 (citing *Handley*, 574 So. 2d at 676). We now turn to those factors.

## A. LENGTH OF THE DELAY

¶42. As this is a constitutional speedy trial claim, the triggering event is the date of Brewer's arrest, May 3, 1992. *See Smith*, 550 So. 2d at 408 (holding that for constitutional purposes the right to a speedy trial attaches at arrest). Brewer was tried on March 20, 1995 -- 1,051 days (more than thirty-four months) after his arrest. It is indisputable that more than eight months had passed from the date of Brewer's arrest to the date his trial commenced. Such a delay is presumptively prejudicial, thereby necessitating an inquiry into the other *Barker* factors. *Id.*

## B. REASON FOR THE DELAY

¶43. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Barker*, 407 U.S. at 531. Also, a more neutral reason for the delay, such as negligence or overcrowded courts, should be weighted against the government, albeit less heavily. *Id.* This Court has held that delay attributable to the defense is excusable. *Smith v. State*, 489 So. 2d 1389, 1391 (Miss. 1986) (explaining that such a delay is understandable where the defendant has "deliberately done something to cause the delay") (citing *Foran v. Metz*, 463 F. Supp. 1088, 1095 (S.D.N.Y. 1979), *aff'd*, 603 F.2d 212 (2d Cir. 1979), *cert. denied*, 444 U.S. 830, (1979) (holding that the defendant, by means of various motions, raised issues which "precluded" the case coming to trial)).

¶44. Here, much of the delay is attributable to the defendant. Brewer filed numerous pre-trial motions following his arrest. During the hearing on his motion to dismiss the prosecution, it was noted by the trial court that this case involved "unusual particular circumstances" which had caused the delay. Particularly, the court found that the instant matter involved capital murder which he personally treated differently due to the gravity of the offense and possible punishment to be imposed. Furthermore, the court noted that there had been such a lengthy delay due to the multitude of motions filed by the defense, which required not only the time, effort and due consideration of counsel for both parties -- but of the trial court as well. Additionally, the trial court noted that the delay had been caused by him giving defense counsel more time to file other motions and the necessary post filing time required to review, hear evidence and subsequently rule on those additional motions.

¶45. The record bears out the lower court's findings. From the date of Brewer's arrest -- May 3, 1992 -- until he filed the motion to dismiss, the 498-day delay attributable to the State was not deliberately designed to hamper or harass Brewer and was not unreasonable. Instead this time was used to conduct necessary pre-trial business, including the appointment of counsel, hold a preliminary hearing, indict and arraign Brewer, hear several defense motions, appoint additional counsel, grant a defense expert, hear more motions and rule on expert fees and a suppression motion.

¶46. After Brewer's motion to dismiss was overruled on September 13, 1993, the remainder of the pre-trial delay was clearly attributable to the defense. On this record, it is apparent that most of the delay was caused by Brewer and should therefore weigh heavily against him. It cannot be said that the State made any deliberate attempts to delay the trial in order to harm the defense. That portion of

the delay attributable to the State was necessary.

## C. DEFENDANT'S ASSERTION OF THE RIGHT TO A SPEEDY TRIAL

¶47. Brewer did not request a speedy trial. He only moved to dismiss the prosecution for a denial of a speedy trial. Indeed, he did not alternatively request an immediate trial in his motion to dismiss. Also on November 20, 1992 during a hearing on various defense motions, counsel for Brewer told the trial court that he had not requested a speedy trial to date, but that he "might" do so. Beyond the motion to dismiss the prosecution, which was premised primarily upon a statutory speedy trial claim, Brewer did not make such a request. Thus, this factor weighs against Brewer. *See Perry v. State*, 637 So. 2d 871, 875 (Miss. 1994) (stating that "a demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for speedy trial . . ."); *see also Barker*, 407 U.S. at 531-32.

## D. PREJUDICE TO THE DEFENDANT

¶48. The final factor to be considered is the prejudice the delay caused to the defendant. The right to a speedy trial was designed to (1) prevent oppressive pretrial incarceration of the accused; (2) minimize anxiety and concern of the accused; and (3) limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532. The most serious of these interests is the last one, as noted by the United States Supreme Court. *Id*.

¶49. Here, Brewer was incarcerated for almost three years before his trial commenced. We have nevertheless held that a lengthy pre-trial incarceration does not *per se* mandate reversal. *See Ross v. State*, 605 So. 2d 17, 23 (Miss. 1992) (maintaining that a defendant's assertion of prejudice attributable solely to incarceration, with no other harm, is typically not sufficient to warrant reversal) (citing *Williamson v. State*, 512 So. 2d 868, 877 (Miss. 1987); *Russell v. Lynaugh*, 892 F.2d 1205, 1215 (5th Cir. 1989)).

¶50. Brewer does not even assert that he suffered trial prejudice because of the lengthy pre-trial incarceration. He generally states that an accused's defense may be impaired by a lengthy delay; however, he does not cite any way in which his defense was so prejudiced. He does not argue that witnesses were unavailable because of the delay or that evidence had been lost or destroyed or that his defense against the charge of capital murder was affected in any way by the delay. Indeed, there is a complete absence of any kind of trial prejudice to Brewer flowing from a delay caused primarily by him.

¶51. Considering the *Barker* factors as a whole, the length of delay in this case was presumptively prejudicial. The vast majority of that delay however was nevertheless not attributable to the State and not prejudicial to Brewer. Thus, we find no merit to this assignment of error.

## III.

## STATUTORY RIGHT TO A SPEEDY TRIAL

¶52. Brewer next argues that he was denied the right to a speedy trial guaranteed by Miss. Code Ann. § 99-17-1 (1994), which provides in pertinent part that:

Unless good cause be shown, and a continuance duly granted by the court, all offenses for

which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.

¶53. In cases involving § 99-17-1 where the facts reflect that the accused's trial did not commence within 270 days of arraignment, the State bears the burden of establishing that there was good cause for the delay. *Vickery v. State*, 535 So. 2d 1371, 1375 (Miss. 1988) (citing *Nations v. State*, 481 So. 2d at 760, (Miss. 1985); *Turner v. State*, 383 So. 2d 489, 491 (Miss. 1980); *Durham v. State*, 377 So. 2d 909 (Miss. 1979)). Where the record is silent regarding the reason for the delay, the clock ticks against the State because it is the State which bears the risk of non-persuasion on the good cause issue. *Vickery*, 535 So. 2d at 1375 (citing *Nations*, 481 So. 2d at 761).

¶54. Brewer was arraigned on September 16, 1992. On November 20, 1992, the trial court held a hearing on a number of defense motions, including a motion to suppress evidence. The trial court ruled on the suppression motion August 25, 1993. Following that order, the defense filed several other motions, including two motions for continuance, a request for change of venue and a request for additional time to locate another expert witness after the initial expert died.

¶55. The days which lapse while a motion to suppress is being considered by the trial court are not counted against the State. *Ford v. State*, 589 So. 2d 1261, 1262-63 (Miss. 1991). Neither does the time which passes during the consideration of numerous defense motions. *Polk v. State*, 612 So. 2d 381, 386 (Miss. 1992).

¶56. It is not disputed that a total of 915 days passed from the time Brewer was arraigned to the commencement of trial -- clearly beyond the 270-day maximum prescribed in § 99-17-1. Nevertheless after deducting the time which lapsed due to defense motions, the court's consideration of the motion to suppress, the two continuances requested by Brewer and a change of venue request, this Court finds that he was tried well within the 270 day limit.

¶57. Sixty-five days had passed when Brewer argued his motion to suppress to the trial court on November 20, 1992. On March 22, 1993, he filed additional motions. By this time, 187 days had passed. The trial court ruled on the motions on August 25, 1993 -- after 343 days had passed. Nineteen days later -- on September 13, 1993 -- Brewer filed the motion to dismiss the prosecution.

¶58. The time between the presentation of the motion to suppress and the judge's ruling on that motion constituted 278 days (November 20, 1992 to August 25, 1993). These days should not be counted against the State. *See Ford*, 589 So. 2d at 1262-63 (time when motion to suppress is being considered should not be counted against the State). Eliminating these 278 days, only eighty-four (84) days were on the statutory clock.[5] On December 21, 1993, Brewer requested a continuance. From the time the motion to dismiss was argued and overruled to the time of Brewer's first continuance, ninety-nine days passed. This brings the total number of days counted against the State to 183.[6] The trial court granted Brewer's change of venue request on March 16, 1994, and the trial date was changed on March 25, 1994. There is no justification for this change in trial dates in the record. Since the record is silent on this issue, we will assume that this delay was attributable to the State. That brings the total number of days counted against the State to 192.[7]

¶59. The record further indicates that on May 27, 1994, defense counsel informally requested a continuance due to the unexpected death of his expert. At that hearing, defense counsel told the trial

court judge that he did not know at the moment whether it was necessary to continue the trial date. It was disclosed that the deceased expert had the State's exhibits, e.g., Brewer's dental models, and that the executrix of his estate had not been very knowledgeable or cooperative regarding the return of those exhibits to the State. The trial court informed both parties that, in light of the death of the expert and the problem with obtaining the State's exhibits, that he would probably end up changing the trial date setting from its previously scheduled date of August 01, 1994. There was no objection from either party to this proposition.

¶60. On July 11, 1994, a new defense expert was appointed and trial was to commence on November 28, 1994. However the defense again moved for a continuance.

¶61. Based upon our careful review of the record evidence and the events which occurred in this matter, this Court concludes that of the 915-day delay between Brewer's arraignment and trial, the State can only be held accountable for 192 days of that total. Following the motion to dismiss, Brewer was responsible for the vast majority of the delay except the nine days between March 16, 1994 and March 25, 1994 -- which are unaccounted for in the record. Furthermore, the subsequent delay following the death of the defense expert was due to Brewer's actions.

¶62. No prejudice resulted from Brewer defending against this charge. Nor was there any oppressive conduct engaged in by the State. *See **State v. Harrison***, 648 So. 2d 66, 71 (Miss. 1994) (explaining that a dismissal with prejudice is not required by the statute unless the state upon finding a violation fails to persuade the court that the violation did not prejudice the defendant's ability to defend against the charge and that the state did not deliberately engage in oppressive conduct). This assignment of error is without merit and does not entitle Brewer to any relief.

## IV.

### DISCOVERY VIOLATION

¶63. In his third assignment of error, Brewer argues the State violated Uniform Criminal Rule of Circuit Court 4.06,[(8)] in effect at the time of his trial, when the prosecutor allegedly failed to disclose the anticipated opinion of Lori Aria, the forensic scientist who analyzed the victim's and Brewer's clothing for evidence. In her report, Aria stated that she observed a substance on the victim's dress that was "possible fecal material." Defense counsel challenged Aria's ability to testify about her findings about the dress, arguing that her opinion was based on "mere possibilities" and not a reasonable degree of medical certainty.

¶64. During the State's proffer outside the presence of the jury, Aria testified that based upon tests performed it was her opinion within a degree of reasonable medical certainty that the substance was "probably" fecal material. Counsel for Brewer moved to exclude the scientist's testimony since her report only said the material was "possibly" fecal matter. The trial court allowed the testimony, finding that the report was timely furnished in discovery and that the report indicated the substance showed a possible fecal material. Brewer presently argues that Aria's testimony should have been excluded and its admission constituted reversible error.

¶65. Rule 9.04(A)(4) requires that "[a]ny reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case" be disclosed by the

prosecutor to the defendant or his attorney. This rule further provides that if, during a trial, the prosecution seeks to introduce evidence which has not been timely disclosed to the defense as required and the defense objects, then the trial court has the authority to either grant the defense an opportunity to examine the documents. If the defendant, upon examination, claims unfair surprise or undue prejudice and *requests a continuance* the trial court shall either exclude the evidence or grant the requested continuance. URCCC 9.04(I) (emphasis added).

¶66. We have established guidelines for dealing with discovery violations in URCCC 9.04(I), which provides in pertinent part that:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:

> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and

> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the nondisclosed evidence or grant a mistrial.

*See also* **Box v. State**, 437 So. 2d 19, 26 (Miss. 1983) (Robertson, J., specially concurring).

¶67. Here, we are not presented with a situation involving undisclosed evidence. In fact, the lab report disclosed that "possible fecal material was observed to be present on the front of the dress." Brewer makes much to do about the use of the word "possible," arguing that the report failed to inform him that Aria had reached an opinion within a reasonable degree of medical certainty that the substance was "probably" fecal material.

¶68. The record evidence belies his assertions. The lab report clearly put Brewer on notice that Aria had found "possible fecal material." During the State's proffer on Brewer's motion to exclude Aria's testimony, the scientist explained that there is no substance in fecal material that is unique, thereby enabling one to absolutely identify a substance as fecal matter. Only after a battery of tests -- in this case sight, smell, microscopic and amalyse -- are conducted can one conclude with a reasonable degree of medical certainty that a substance is or is not fecal in nature.

¶69. Brewer's reliance on *Acevedo v. State* to argue that Aria's conclusion was a surprise is misplaced. The opinion she rendered at trial did not totally contradict her findings in the lab report as was the case in *Acevedo*. There, the State's expert witness abandoned the conclusions in his lab report during trial and rendered a totally different one, of which the defense was not made aware. This Court found error. *Acevedo v. State*, 467 So. 2d 220, 223-24 (Miss. 1985).

¶70. A totally different situation is presented in this instance. Here, the scientist's use of the word "possible" to describe whether the substance was fecal matter was an exercise in scientific caution in light of her testimony that there is nothing in fecal matter which guarantees or makes possible its absolute identification. Furthermore, assuming that the scientist's opinion did in fact unfairly surprise

or prejudice Brewer, he had a duty to request a continuance. *URCCC 9.04(I)*; *Box*, 437 So. 2d at 26. He failed to do so, and such a failure constitutes a waiver.

## V.

### *BATSON* VIOLATION

¶71. Brewer next alleges racial discrimination in the State's use of its peremptory challenges against several black jurors. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It is the State's position that Brewer waived the right to claim error when he failed to object to the jury before it was sworn, citing *Jones v. State*, 517 So. 2d 1295, 1310-11 (Miss. 1987); *Pickett v. State*, 443 So. 2d 796, 799 (Miss. 1983).[(9)] The State further asserts that Brewer's claim falls short due to his failure to designate a complete record for this Court's review. Lastly, the State maintains that the reasons given by the prosecutor for his exercise of the peremptory challenges were not pretextual.

¶72. In order for a defendant to establish a prima facie case of purposeful discrimination in the selection of jury members, he must show: (1) that he is a member of a "cognizable racial group"; (2) that the prosecutor has exercised peremptory challenges toward the elimination of venire members of his race; and (3) that facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities. *Berry v. State*, 703 So. 2d 269, 294 (Miss. 1997) (citing *Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989); *Batson*, 476 U.S. at 96-97; *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987)).

¶73. The trial court initially stated that no prima facie case of purposeful discrimination had been shown here; however, the court went on to require the State to give race-neutral explanations for its peremptory challenges. Thus, an analysis of those reasons follows.

¶74. When a *Batson* issue arises, the trial judge acts as finder of fact. *Berry*, 703 So. 2d at 295. This Court may not substitute its judgment for that of the trial judge if there is sufficient evidence in the record to support the judge's findings. *Id.* (citing *Turner v. State*, 861 S.W.2d 36, 39 (Tex.App. Houston 1993)). Here, Brewer offered no rebuttal to the prosecutor's race-neutral reasons. Thus, the trial court's findings are based on the State's reasons only. *Bush v. State*, 585 So. 2d 1262, 1268 (1991).

¶75. The State's first peremptory challenge was to a black female. The reasons given were that she had been employed in two other places other than her current one although she was only thirty-nine years old. She had a college degree; yet she was only a cashier at Fred's, which showed a lack of success and that such individuals are frequently bitter with a very sour outlook on life. She had a penchant for soap operas which showed that she tended to live in a fantasy world and believed things that she saw on television, as well as believed in conspiracies, ghosts, goblins and things of that nature. The trial court found the above to be a race-neutral reason.

¶76. The State's third peremptory strike[(10)] was to a black female, and the reasons for that challenge included: she intimated on the questionnaire that she was very religious, loved people, Jesus and her family. The prosecutor did not feel she could give the death penalty in light of her response that she loved people. He found it inherently inconsistent to say that one loves people, but is nevertheless going to kill a person. The trial court initially stated that this was not a sufficient race-neutral reason,

but reserved his final ruling until the end of the hearing.

¶77. The State's fourth challenge was to a black man who, the record explicitly shows, had attempted to get off jury duty from the start. The man told the trial court that he was disabled, suffered from headaches and dizzy spells. He had been arrested in 1968 for public drunkenness. The court found this to be a sufficient race-neutral reason. The fifth peremptory challenge was to a black man who had been arrested for a drug offense and convicted of that offense in city court. Also, the man had no children, and his family members were well known to the prosecutor for being in trouble with the law. The trial judge accepted these reasons.

¶78. The State's sixth peremptory challenge was to a black woman who did not completely fill out the questionnaire -- leaving the party and religious preference parts blank. She was a Rice, and there were many members of the Rice family who were on file with the worthless check unit. Also, a Roger Rice had been tried in the court although the prosecutor could not say if the woman was related to these people. Also, she read the types of publications that frequently "railed" against the death penalty. The judge accepted the prosecutor's reasons.

¶79. The seventh challenge was to a black woman who had been a juror in a criminal case where no verdict was reached. In addition, the woman had been arrested for shoplifting and she might have been related to a man who was previously tried in the same court. These reasons were acceptable. The State's final peremptory challenge to a black person was to a black woman who stated that she too watched a lot of soap operas, who did not list an occupation on the jury form and who only had a grade school education. The prosecutor did not believe she would be able to understand the testimony of the dental experts. The proffered reasons were accepted by the court as race-neutral.

¶80. "A peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause." *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995) (citing *Batson*, 476 U.S. at 97); *Harper v. State*, 635 So. 2d 864, 867 (Miss. 1994); *Benson v. State*, 551 So. 2d 188, 192 (Miss. 1989)). "The establishment of a race neutral reason is not a difficult task." *Stewart*, 662 So. 2d at 558. However, the prosecutor does not rebut a prima facie case of purposeful discrimination by merely denying that he had a discriminatory motive or by "affirm[ing] [his] good faith in making individual selections." Instead, the prosecutor must articulate a neutral explanation related to the particular case to be tried. *Batson*, 476 U.S. at 98.

¶81. The trial court decided in this instance that the State offered sufficient race-neutral reasons for its peremptory challenges, including its third strike which the trial court initially found insufficient. The record supports the trial court's decision. In *Lockett*, this Court provided a list of race-neutral reasons accepted in other jurisdictions for guidance. *Lockett*, 517 So. 2d at 1356-57.

¶82. The only reasons not included which were given here were the prosecutor's beliefs about people who watch soap operas and who state they love people but could nevertheless sentence someone to death. This Court concludes that these reasons are also sufficiently race-neutral. In *Batson*, the Supreme Court pointed out that "'[t]here are any number of bases' on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause." *Batson*, 476 U.S. at 98 n 20 (quoting *McCray v. Abrams*, 750 F.2d 1113,1132 (2d Cir. 1984)). The only requirement is that the prosecutor give clear and reasonably specific explanations for his reasons. *Id.* This Court has implicitly recognized that a prosecutor may follow his intuition so long as his judgment does not tell

him that "'... [black jurors] would be partial to the defendant because of their share[d] race.'" ***Lockett***, 517 So. 2d at 1352 (citing ***Williams v. State***, 507 So.2d 50, 52 (Miss.1987)). Regarding the jurors who watched soap operas, and the juror who stated that she loved people, the prosecutor was merely following his intuition or perception as to those jurors' suitability for a capital murder trial. There is absolutely no indication that the prosecutor struck these jurors for racial reasons. The trial court accepted these reasons and effectively overruled Brewer's ***Batson*** challenge. The record buttresses the trial court's findings and they will be given deference accordingly. Moreover, this is a case involving a black victim, a black defendant and a jury which was comprised of blacks, thereby diminishing Brewer's contention that the prosecutor purposely struck black jurors.[(11)] *See* ***Mack v. State***, 650 So. 2d 1289, 1298 (Miss. 1994).

## VI.

## PROPRIETY OF REJECTING AN ACCOMPLICE INSTRUCTION

¶83. In his fifth assignment of error, Brewer asserts the trial judge erred when he failed to grant his requested "caution and suspicion" instruction on accomplice testimony. According to Brewer, the victim's mother was an accomplice under these facts and her testimony deserved to be viewed suspiciously by the jury. The State maintains that Gloria Jackson was not an accomplice and the simple fact that she was originally arrested and charged as an accomplice after the fact does not render her such.

¶84. In ***Derden v. State***, 522 So. 2d 752 (Miss. 1988), this Court stated that as a rule a trial judge should not hesitate to grant a cautionary instruction when the State is relying upon the testimony of co-conspirators. In ***Van Buren v. State***, 498 So. 2d 1224 (Miss. 1986), this Court further stated that "[t]he granting of a cautionary instruction regarding the testimony of an accomplice is discretionary with the trial judge." ***Id.*** at 1229 (quoting ***Holmes v. State***, 481 So. 2d 319, 322 (Miss. 1985). However, that discretion is not absolute; it may be abused. ***Ferrill v. State***, 643 So. 2d 501, 507 (Miss. 1994). In determining whether a trial court has abused its discretion in refusing a cautionary instruction on accomplice testimony, two factors should be considered: first, whether the witness was in fact an accomplice and if so, whether the witness' testimony was without corroboration. ***Id.*** (citing ***Derden***, 522 So. 2d at 754). An accomplice is a person who is implicated in the commission of a crime. ***Id.***

¶85. For present purposes, if the evidence admitted a reasonable inference that the victim's mother may have been a co-perpetrator of the capital murder and sexual battery of her three-year-old daughter, then Brewer's cautionary instruction should have been given. However, no such reasonable inference may be drawn from these facts. Nothing in the record intimates that Gloria Jackson participated in the murder and sexual assault of her child nor the subsequent failed attempt to cover up the crime. Furthermore, there is no semblance of evidence in the record from which one could reasonably infer or imply that Jackson even possessed knowledge of the crime -- before or after its commission. Moreover as the State asserts, the mere fact that Jackson was charged as an accomplice after the fact without evidence to support the charge does not prove or transform her into an accomplice.

¶86. Because the evidence did not show that the mother was an accomplice, the trial court properly refused to grant the requested cautionary instruction. This assignment of error is therefore lacking in

merit.

## VII.

## COMMENT ON BREWER'S FAILURE TO TESTIFY

¶87. Brewer next asserts that the prosecutor "indirectly" commented on his failure to testify. The particular comments cited by Brewer in support of his position follow:

> What other options are there; who else could possibly kill this child; who else fits into all of those sets except Kennedy Brewer. . . . What reasonable hypothesis consistent with innocence can you arrive at ladies and gentlemen?

¶88. The State responds, on the one hand, that Brewer failed to object to these allegedly improper comments and that, on the other hand, these comments "come no where near an impermissible comment on Brewer's right to remain silent." The State's position is well taken.

¶89. "'A defendant has a constitutional right not to take the witness stand. This right becomes meaningless if comment or insinuation can be made reflecting upon his failure to testify.'" *Carr v. State*, 655 So. 2d 824, 845 (Miss. 1995) (quoting *Livingston v. State*, 525 So. 2d 1300, 1306 (Miss. 1988)), *cert. denied*, 516 U.S. 1076 (1996). "A prosecutor is prohibited, either by direct comment, insinuation or innuendo, from commenting on the defendant's failure to testify." *Carr*, 655 So. 2d at 845 (citing *Peterson v. State*, 357 So. 2d 113, 117 (Miss. 1978)). Cases in which this Court has found a prosecutor's comment improper include *Brown v. State*, 340 So. 2d 718, 721 (Miss. 1976), in which the prosecutor said, "It's undisputed...Nobody disputed his testimony." In *Griffin v. State*, 557 So. 2d 542 (Miss. 1990), this Court held the following remarks improper: "[T]hey tell you, there's one man alive today who can tell you what happened, and I agree with that. There is one person who could tell you what happened and we have -- we have a statement -- we have a statement from him. We have a confession, an oral confession, we have a written confession, yes, we do." *Id.* at 552.

¶90. The challenged remarks in the present matter cannot, even under the most deferential reading, be interpreted as comments on Brewer's failure to testify, nor do they constitute insinuation or innuendo of the same. Brewer's constitutional rights were not violated, and this assignment of error lacks merit.

## VIII.

## QUALIFICATIONS OF THE STATE'S EXPERT FORENSIC ODONTOLOGIST

¶91. Assignment of error seven asserts that the trial court erred in accepting Dr. West as an expert in the field of forensic odontology. Brewer takes issue with the difficulties West experienced which stemmed from his involvement in a Mississippi case, *Maxwell v. State*. He argues that West should not have been qualified as an expert in light of these difficulties.

¶92. The State disagrees and asserts that West was properly qualified as an expert in this matter. The record evidence bears out the State's position.

¶93. Miss. R. Evid. 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

¶94. Once it is determined, pursuant to Rule 702, that expert testimony will be helpful to the finder of fact, a determination must then be made that the expert is indeed qualified in his field. That determination is left to th e sound discretion of the trial court. *Poirrier v. Degrande*, 604 So. 2d 268, 270 (Miss. 1992) (citing *Miller By Miller v. Stiglet, Inc.*, 523 So. 2d 55, 59-60 (Miss. 1988); *Hall v. Hilbun*, 466 So. 2d 856, 873 (Miss. 1985); *House v. State*, 445 So. 2d 815, 822 (Miss. 1984)). The trial court's determination on this issue may only be reversed if it clearly appears that the witness was not qualified. *Wilson v. State*, 574 So. 2d 1324, 1334 (Miss. 1990) (citing *Smith v. State*, 530 So. 2d 155, 162 (Miss. 1988)). Stated otherwise, unless the trial court abuses its discretion reversal will not occur.

¶95. There has been no abuse of discretion in this matter. First, Brewer and the State stipulated that there is a body of scientific knowledge which allows for the identification of individuals based upon bite mark examination on soft tissue. At the same time, defense counsel explained that Brewer was not challenging the science, but the qualifications of the State's expert.

¶96. Concerning Dr. West's qualifications, he was a licensed dentist and coroner of Forest County, Mississippi at the time of trial. He had lectured extensively on the subject of forensic odontology and published and presented more than thirty papers on the subject. In addition, he had rendered expert opinion testimony on the subject of bite mark evidence in numerous cases -- seven of which occurred after he was suspended from the American Board of Forensic Odontology (hereinafter "ABFO") and resigned from the International Association of Identification (hereinafter "IAI") and the American Academy of Forensic Sciences (hereinafter "AAFS").

¶97. The problems Dr. West encountered in *Maxwell* centered on his use of his novel ALI technique. West testified before the trial judge that using the four hundred and fifty nanometer blue light he was able to see a bruise in the center of the accused's palm that perfectly matched the murder weapon. West purportedly took pictures of his discovery, but overexposed the film. The trial court refused to allow West to testify concerning his alleged observations, and the ABFO suspended him for his testimony as he had no proof to substantiate his claims that he had seen the bruise and that the ALI source could detect such a bruise.[12] In short, it was determined that he testified beyond his area of expertise.

¶98. Following the *Maxwell* fiasco, Dr. West failed in *Louisiana v. Keko* to disclose to the trial judge that he had been suspended from the ABFO. As Dr. West and Dr. Souviron -- Brewer's dental expert -- explained, the rules of the ABFO forbade such a disclosure until the matter and appeals were concluded. These organizational difficulties -- taken in context -- do not adversely reflect upon or affect West's qualifications. In the present case, the trial court determined that West's testimony would be helpful to the jury. West clearly possessed specialized knowledge and experience in the field of bite mark analysis. Brewer's objection to Dr. West as an expert lies in West's ALI technique; however, as Dr. West testified, his four hundred and fifty nanometer blue light played no role whatsoever in the basis of his expert opinion that Brewer inflicted the bite marks on the victim.

Indeed, West admitted that while he used his ALI technique to look at the body of Christine Jackson, the ALI source did not show anything that was not visible to the naked eye.

¶99. In addition, Brewer's own dental expert found nothing objectionable about West's qualifications, begrudgingly admitting that West was "brilliant" and that his ALI technique had definite merit. Dr. Souviron even admitted that there was nothing wrong with the direct comparison technique used by West in comparing Brewer's dental impression to the bite marks on the victim. He admitted using this technique himself. He did question West's failure to perform a biopsy of one of the areas West opined was a bite mark wound. However, he retreated from this position on cross-examination when it was pointed out that the child's body was in the early to moderate stages of decomposition, which made it very difficult to perform a biopsy that could be preserved for the opposing expert's analysis.

¶100. The record evidence shows that Dr. West possessed the knowledge, skill, experience, training and education necessary to qualify as an expert in forensic odontology. The problems he encountered in *Maxwell* and *Keko* went to the weight and credibility to be assigned his testimony by the jury -- not his qualifications. As such, this assignment of error entitles Brewer to no relief.

## IX.

### *SUA SPONTE* EXCLUSION OF THE VIDEOTAPE

¶101. Here, Brewer argues the trial court abused its discretion in *sua sponte* excluding a color videotape which showed Dr. West performing the direct comparison test of his teeth and the bite mark wounds on the child's body. Both the State and Brewer wanted the videotape admitted; however the State requested that the volume be turned off while the jury viewed the tape due to the conversations and background music depicted on the tape. Brewer wanted the videotape played to the jury with the volume on. Brewer contended the videotape underscored his expert's opinion that the wound patterns on the child's body were not bite marks, but instead were caused by other trauma, decomposition and skin slippage. Additionally, he argued the tape showed how Dr. West had to manipulate his dental impression to match it with the alleged bite marks, indicating the impossibility of a normal human jaw to approach the surface of the body in such a manner.[(13)]

¶102. The trial court reviewed the tape in-chambers and subsequently ruled that it would not be admitted into evidence as it was "particularly gruesome and macabre" and contained callous conversations and inappropriate music. The court further ruled the video would not be introduced into evidence since the State conceded it would not be used by Dr. West in formulating an opinion, since Dr. West actually performed the examination depicted on the video, which was adequately depicted via the black and white photographs admitted into evidence, and because the probative value was outweighed by undue prejudice.

¶103. The State presently maintains the trial court's exclusion of the videotape was within its discretion and that this discretion was not abused as the trial court found the videotape to be "particularly gruesome and macabre." Additionally, the State asserts that the black and white photographs of Dr. West's examination of the child's body depicted the exact procedure and wounds illustrated on the videotape, thereby rendering the videotape cumulative at best.

¶104. This Court has repeatedly held that the admissibility of photographs rests within the sound

discretion of the trial judge, and his decision will not be disturbed unless that discretion is abused. *See, e.g.,* **Hunt v. State**, 538 So. 2d 422 (Miss. 1989); **McFee v. State**, 511 So. 2d 130, 134 (Miss. 1987); **Kelly v. State**, 463 So. 2d 1070, 1074 (Miss. 1985); **Koch v. State**, 506 So. 2d 269, 271 (Miss. 1987). The standard of admissibility which applies to photographs also applies to videotapes. **Holland v. State**, 587 So. 2d 848, 864 (Miss. 1991); **Blue v. State**, 674 So. 2d 1184, 1210 (Miss. 1996). Photographs, and necessarily videotapes, deemed gruesome or inflammatory or that lack an evidentiary purpose are always inadmissible as evidence. **Id.** (citing **McNeal v. State**, 551 So. 2d 151, 159 (Miss. 1989)).

¶105. Miss. R. Evid. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶106. It is this Court's opinion, after reviewing the videotape, that the *sua sponte* exclusion of the videotape constituted error, but not reversible error for the following reasons. We see no sound basis for the exclusion of the tape. It clearly depicted the process of comparing the marks to the dental impressions in motion as opposed to still photographic forms. The background sounds were not significant to the extent that it would have been error to exclude them or to admit them. Because the videotape was more useful than the still photos and because both sides clearly wanted to use the tape, the trial court erred in excluding it.

¶107. That said, the videotape would not, on our view of it, have changed the outcome of the trial however. It was as compelling for the State as it was for Brewer. In addition, there was nothing in the videotape that was not contained in the one hundred plus photographs admitted into evidence. Thus, the videotape was not necessary nor was it exculpatory; therefore the *sua sponte* exclusion of it was error, albeit harmless.

## X.

### FAILURE TO SUPPRESS EVIDENCE

¶108. In his ninth assignment of error, Brewer contends the trial court erred in failing to suppress all physical evidence obtained from him by law enforcement officers following his illegal arrest. He contends further that he was not provided a timely initial appearance, and as such all evidence obtained prior to his initial appearance which was admitted during the trial constituted reversible error.

¶109. The State, conceding that Brewer was under arrest from May 3, 1992, argues law enforcement officials had probable cause to arrest him, that he was provided a timely initial appearance and that he voluntarily consented to give a dental impression.

¶110. On September 16, 1992, Brewer moved to suppress all statements made by him and all physical evidence obtained from him, arguing that his arrest was not based upon probable cause. A hearing on the motion to suppress was held on November 20, 1992. At this hearing, Sheriff Permenter testified that upon arriving at the Jackson home and investigating, he concluded there had been no forced entry into the home and that Brewer was the last person to be with the child before her

disappearance. He further testified that during his investigation Jackson and Brewer appeared to be "pretty nervous and upset." According to Permenter, they were licking their lips and their hands were shaking. They were also blaming each other for the child's disappearance. Based upon these facts, Permenter placed the individuals in his patrol car, and they were subsequently taken to jail by Sheriff Walker.

¶111. That same day, Permenter obtained Brewer's clothing and Brewer agreed to submit sexual assault kit samples. Permenter testified that he did not obtain a consent to search form or a search warrant in light of Brewer's acquiescence.

¶112. The child's body was found on May 5, 1992.[(14)] Permenter took a statement from Brewer supposedly after the child's body was found.[(15)] This statement was suppressed. He also asked Brewer on the following Thursday (as far as he could recall) May 7 if he would submit a dental impression because the autopsy had been performed, indicating numerous bite marks on the child's body. Brewer agreed to submit a dental impression; however, no search warrant or consent form was obtained from Brewer prior to him giving a dental impression to Dr. West.

¶113. Brewer was taken for an initial appearance on May 7 -- four days after being taken into custody and the same day he gave a dental impression.[(16)] Permenter testified that Brewer was not taken before a magistrate sooner than May 7 because his main concern was finding the child. Brewer requested an attorney on May 7.

¶114. The trial court also heard testimony from Investigator Eichelberger at the hearing on Brewer's motion to suppress. Eichelberger was present when Brewer gave a statement on May 4. He corroborated Permenter's statement that Brewer was given his *Miranda* warnings and that he was not threatened or coerced in any way. Eichelberger also took statements from Brewer. These statements were likewise suppressed. According to Eichelberger, Brewer was taken for his initial appearance and to give dental impressions on May 8.[(17)]

¶115. Brewer presented no testimony at the suppression hearing. In an order dated November 23, 1992, the trial court ruled that the physical evidence obtained from Brewer -- the dental impression and rape kit samples -- were admissible because they were "identifying characteristics" similar to fingerprints.

## A. Whether Brewer's arrest was illegal

¶116. The initial issue to be considered is whether Permenter had probable cause to arrest Brewer on May 3, 1992.

¶117. In order to make a felony arrest without a warrant, the arresting officer must have probable cause to believe a felony has been committed and probable cause to believe the suspect to be arrested committed the felony. *Floyd v. State*, 500 So. 2d 989, 991 (Miss.1986), *cert. denied*, 484 U.S. 816 (1987); *Swanier v. State*, 473 So. 2d 180, 186 (Miss.1985); Miss.Code Ann. § 99-3-7 (1994). "The existence of "probable cause" or "reasonable grounds" justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The determination depends upon the particular evidence and circumstances of the individual case." *Smith v. State*, 386 So. 2d 1117, 1119 (Miss. 1980) (quoting

*McCollum v. State*, 197 So. 2d 252, 254-55 (Miss. 1967)). The facts necessary to uphold an arrest without a warrant must be sufficiently strong to support the issuance of a warrant for arrest. *Swanier*, 473 So.2d at 186.

¶118. Probable cause did not exist to arrest Brewer on the morning of May 3, 1992. Sheriff Permenter testified during the suppression hearing that he knew the child was missing and that he believed a crime had been committed. However, he had no basis -- beyond his own suspicions -- to conclude that a crime had been committed or that Brewer was the perpetrator. He even admitted that as far as he knew the child could have walked on the scene at any time. Additionally, there was nothing found at the house which intimated that a crime had been committed.

¶119. The only information upon which the arresting officer acted was the fact that the child was missing and that Brewer babysat the child the night before. This was not enough to establish probable cause. Probable cause exists when there is more than bare suspicion yet less than the evidence that would justify condemnation. *Wagner v. State*, 624 So. 2d 60, 66 (Miss. 1993) (citing *Henry v. State*, 486 So. 2d 1209, 1212 (Miss. 1986)). Similarly, the facts supporting Permenter's arrest of Brewer on May 3 would not have been sufficiently strong enough to support the issuance of an arrest warrant. Thus, Brewer is correct that his arrest on May 3 was illegal.

¶120. The question then becomes whether the items recovered from Brewer following the illegal arrest should have been admitted into evidence. Deputy Permenter testified that he recovered Brewer's clothing on the night of his arrest and that he asked Brewer to undergo a rape kit test that same night. Assuming that these items were obtained the night of the illegal arrest, they were clearly fruit of the poisonous tree and should not have been used in the trial of this matter. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). Nevertheless, this Court finds that these items -- Brewer's clothes and the results of the rape kit analysis -- added absolutely nothing inculpatory to this case because the crime lab results were inconclusive on all points. Thus, the error in admitting this evidence was harmless beyond a reasonable doubt.

¶121. On May 6, 1992, law enforcement officials obtained a warrant for Brewer's arrest. By this time, the child's body had been located. Thus, at this point in time -- May 6 -- Brewer was properly under arrest. The officers knew that the child had been murdered and that she had been assaulted by a man, evidenced by the autopsy results. They also were aware that Brewer was the last man with the child before her disappearance. This information provided the officers with more than mere suspicion on which to secure an arrest warrant. As such, we conclude that when the arrest warrant was obtained on May 6 this marked a "second arrest," properly founded upon probable cause which was not obtained through any exploitation of the initial illegal arrest. *See United States v. Edwards*, 103 F.3d 90, 95 (10th Cir. 1996) (finding that the initial arrest of the defendant was illegal as there was no probable cause, but that the subsequent arrest after finding a "drug processing station" in car was proper and not the result of the initial arrest) (citing *United States v. Walker*, 535 F.2d 896, 899 (5th Cir.), *cert. denied*, 429 U.S. 982 (1976)).

¶122. All evidence seized from Brewer post-second arrest was therefore not *per se* inadmissible. The only evidence obtained from him after the arrest warrant was the dental impression, to which he consented. The trial court ruled that the dental impression was admissible as it was a matter of physical identifying characteristic comparable to fingerprints and also that Brewer consented.

¶123. This Court in *Porter v. State*, 519 So. 2d 1230 (Miss. 1988) adopted the United States Supreme Court's view that the Fifth Amendment only barred the compelled production of testimonial evidence, not evidence identifying physical characteristics. In *Porter*, the issue was whether the accused could be compelled to exhibit a scar on his hand. This Court found the exhibition less intrusive than routine blood tests and fingerprints. *Id.* at 1232. This Court relied upon *Schmerber v. California*, 384 U.S. 757, 764 (1966), which noted that the protection against self-incrimination did not include "compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.* The Supreme Court further noted that the privilege against self-incrimination applied to circumstances involving communications or testimony. *Id.*

¶124. Other courts have also recognized the similarity between dental impressions and fingerprints or handwriting examples as physical identifying characteristics. *See Patterson v. State*, 509 S.W.2d 857 (Tex.Crim.App.1974) (holding there was no constitutional impediment, either as a search and seizure or concerning the privilege against self incrimination, preventing the taking of dental impressions from a criminal defendant as such a taking is analogous to fingerprints for constitutional purposes; further holding this type of relatively unintrusive identification evidence seizable without constitutional implication); *People v. Milone*, 356 N.E.2d 1350, 1355 (Ill. App. Ct. 1976) (1995) (holding that dental impressions, like fingerprints or voice exemplars, are fixed characteristics of the body of the defendant and as such do not fall within the ambit of the Fifth Amendment); *State v. Sapsford*, 488 N.E.2d 218, 219 (Ohio Ct. App. 1983) ("The taking of dental casts, photographing teeth and making wax impressions are identification procedures . . . not unlike the extraction of blood and the taking of photographs or fingerprints"; holding that a court order or search warrant is not required to take dental casts, photographs and wax impressions for identification purposes); *State v. Thornton*, 322 S.E.2d 711 (Ga. 1984) (dental impression is analogous to the taking of fingerprints); *People v. Allah*, 376 N.Y.S.2d 399 (N.Y. Sup. Ct. 1975) (taking of a dental impression is simply a form of obtaining real or physical evidence which in no way violates the Fourth or Fifth Amendment).

¶125. Thus, we hold that the trial court's admission of the dental impression into evidence was proper as the impression was nothing more than evidence identifying a physical characteristic -- very similar to fingerprints and handwriting or voice exemplars.

¶126. Concerning Brewer's Sixth Amendment right to counsel claim, the taking of the dental impression was like the taking of fingerprints -- which this Court has held not to be a critical stage so as to require counsel's presence. *Newton v. State*, 321 So. 2d 298, 300 (Miss. 1975) (explaining the right to have an attorney present during a critical stage of the prosecution does not extend to a step in the prosecution such as the gathering of evidence by the taking of fingerprints, blood samples, clothing, or hair)(citing *United States v. Wade*, 388 U.S. 218 (1967)).

¶127. While Brewer's initial arrest was illegal, the second arrest was not as it was based upon sufficient probable cause. As such, that evidence obtained after the second arrest -- the dental impression -- was properly admitted into evidence.

## B. Whether Brewer was denied a timely initial appearance

¶128. Brewer further argues he was not provided a timely initial appearance in violation of Rule 1.04 in effect at the time of the murder. Rule 1.04, currently Rule 6.03, provides in pertinent part that "[e]

very arrested person shall be taken before a judicial officer without unnecessary delay." However, lack of access to a judge is a valid reason for the delay in providing an accused an initial appearance. *Nicholson v. State*, 523 So. 2d 68, 76(Miss. 1988) (Robertson, J., concurring).

¶129. In the present case, Brewer suffered no trial prejudice from the delayed initial appearance. No statements or evidence obtained from him before his initial appearance were admitted during the trial. Thus, we find no merit in this assignment of error.

## XI.

## IMPROPER COMMENTS DURING CLOSING ARGUMENT

¶130. Here, Brewer argues the prosecutor made improper comments during closing argument in the sentencing phase of trial. Specifically, Brewer takes issue with the following comments:

> Of course, it is their perception that this defendant will be deterred by a sentence of life without parole. Maybe. There is always the possibility that he might escape, you all realize that, and I don't think any one of you would want to pick up the paper some day and read where this man had done something else to somebody else because in a moment of weakness you did that which you were urged to do.

He asserts that these comments were "totally speculative" and that they introduced an "arbitrary factor" before the jury for consideration.

¶131. The State concedes that the prosecutor did, in fact, tell the jury that they should consider the possibility that Brewer could one day escape if given a life sentence without parole; however, the State argues that Brewer failed to object to the argument and also failed to cite the comment as a ground for a new trial. Thus, it is the State's position that this issue is procedurally barred. Notwithstanding the bar, the State responds that the jury was properly instructed that comments by counsel were not evidence and that they should decide punishment based solely upon the weighing of aggravating and mitigating circumstances. Additionally, the State posits that the prosecutor's comments were properly made in response to defense counsel's contention that life without parole would serve as an adequate deterrent of keeping Brewer from murdering again. The State's positions regarding the procedural bar and the propriety of the prosecutor's comments are well taken.

¶132. In *Johnson v. State*, 477 So. 2d 196, 209-10 (Miss. 1985), *cert. denied*, 476 U.S. 1109, *reh'g denied*, 476 U.S. 1189 (1986), this Court held that:

> [I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment.

The requirement that counsel make a contemporaneous objection to questionable argument applies to death penalty cases as well. *Evans v. State*, Nos. 93-DP-01173-SCT, 94-CA-00176-SCT, 1997 WL

562044, at \*53 (Miss. Sept. 11, 1997) (citing **Williams v. State**, 684 So. 2d 1179, 1203 (Miss. 1996)). Nevertheless, this Court has held that it may consider alleged errors on the merits without waiving the procedural bar. **Evans**, 1997 WL 562044, at \*56 (citing **Chase v. State**, 645 So. 2d 829 (1994), *cert. denied*, 515 U.S. 1123, *reh'g denied*, 515 U.S. 1179 (1995); **Foster v. State**, 639 So. 2d 1263, 1270 (Miss. 1994), *cert. denied*, 514 U.S. 1019 (1995)).

¶133. There are, we noted in **Evans**, certain well established limits beyond which counsel is forbidden to go in reference to closing arguments. **Evans**, 1997 WL 562044, at \*61. A prosecutor must confine himself to the facts introduced in evidence and to the fair and reasonable deductions and conclusions to be drawn therefrom and to the application of the law, as given by the court, to the facts. **Id.** Absent impermissible factors such as commenting on the failure of the defendant to testify, a prosecuting attorney is entitled to some latitude in closing argument. **Id.** at \*62 (citing **Dunaway v. State**, 551 So. 2d 162, 163 (Miss. 1989)). This Court has recognized, as permissible and proper, instances in which a prosecutor responds to defense counsel's comments or a defendant's request for mercy. *See* **Walker v. State**, 671 So. 2d 581, 614-15 (Miss. 1995) (finding no error in prosecutor's argument which rebutted defense counsel's efforts to show that the State's chief witness was lying; also upholding prosecutor's remarks that were in direct response to the defendant's attempts to show remorse) (citing **Knox v. State**, 502 So. 2d 672 (Miss. 1987)); *see also* **Booker v. State**, 511 So. 2d 1329, 1331-32 (Miss. 1987) (citing **Unites States v. Young**, 470 U.S. 1(1985)).

¶134. In this instance, Brewer did not object to the prosecutorial argument he now cites as reversible error. His failure to object effectively waived the alleged error and renders this assignment of error procedurally barred. **Evans**, 1997 WL 562044, at \*53; **Williams**, 684 So. 2d at 1203. Without relaxing the procedural bar, the merits of Brewer's claim will be considered nonetheless. **Evans**, 1997 WL 562044, at \*56; **Chase**, 645 So. 2d at 835; **Foster**, 639 So. 2d at 1270.

¶135. The State asserts the prosecutor's comments were provoked by defense counsel's comments. Prior to the prosecutor's allegedly improper argument, counsel for Brewer stated among other things that:

> [W]hat I'm asking you to do is to sentence Kennedy Brewer to life without parole. . . . Life without parole means exactly what it says. . . If you take that option it means that Kennedy Brewer will forthwith go to the state penitentiary over at Parchman and he will be placed in a maximum security unit because of the crime that he's convicted for, and he will never get out. . . . He will stay there the rest of his life, no possibility of parole. . . . It interested me when Mr. Allgood asked about nobody else, there's been no similar crime since Kennedy Brewer was locked up in nineteen ninety-two. You can make sure that Kennedy Brewer never does that again by locking him up for the rest of his life. . . .

¶136. Following these comments, the prosecutor made his remarks about the possibility of escape if the jury sentenced Brewer to life without parole. The State's comments were in response to defense counsel's statement that life without parole assured that Brewer would remain in prison for the rest of his life, guaranteeing that a similar crime would not be perpetrated by him.

¶137. Evaluating the remarks in context and taking into consideration the circumstances of the case in deciding the propriety of the comments, **Ahmad v. State**, 603 So. 2d 843, 846 (Miss. 1992), the test is whether the natural and probable effect of the improper argument created an unjust prejudice

against the accused as to result in a decision influenced by the prejudice so created. *Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988).

¶138. While prosecutorial speculation about the possibility of escape has no place in closing argument in the penalty phase, especially where there is no proof of a relevant history on that issue, we are not persuaded that the comments here were of such a character or substance that Brewer's right to a fair trial was compromised or that the jury's verdict of death was based upon the consideration of the possibility of escape. Instead, the State emphasized the fact that a three-year-old child was savagely raped and murdered, that Brewer admitted he made good grades in school, knew right from wrong and knew that it was wrong to rape and kill the child.

¶139. Because Brewer failed to object to the allegedly improper prosecutorial comment and because the comment was a response to the previous argument of defense counsel, we conclude this assignment of error is without merit.

## XII.

## INSUFFICIENCY OF THE EVIDENCE

¶140. Brewer next alleges insufficiency of the evidence, emphasizing the fact that the State's case was based upon circumstantial evidence. He claims the State's evidence was not strong because the victim's mother testified she saw Brewer place the child on the floor, that she saw no blood, that Brewer was not acting nervous and that he denied harming the child. He asserts further the mother's testimony that she locked the door when she came home was questionable considering the fact that she was admittedly high. Also, he posits that none of the DNA and physical evidence pointed towards him as the blood and semen tests were inconclusive. In addition, Brewer emphasizes the testimony of Dewayne Graham and Leshone Williams, whereby they stated the child was alive, albeit asleep, during their visit and that they left the home at 11:50 p.m. -- providing only a forty minute window of opportunity.

¶141. The State argues the contrary -- that there was more than enough evidence to find Brewer guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. The State asserts that Jackson and Brewer were the only adults in the house the night the child disappeared and that there were no signs of forced entry. Also, a search dog tracked Brewer's scent to the general area where the child's body was found. Additionally, human blood was found on the blanket used to cover the child and sperm was found in her vaginal vault, indicating that she was sexually battered by a man. Still further, the State emphasizes the fact that the child's body was covered with bite marks, which were confirmed by the State's expert as being inflicted by Brewer. Moreover, while in jail together, Brewer and the mother fought and Brewer told her "dat it need to been [the mother] dat he kilt." It is the State's position that Brewer is the only person who could have possibly committed the crime.

¶142. Both parties direct this Court's attention to *McFee v. State*, 511 So. 2d 130 (Miss. 1987) in which this Court noted:

When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by

considering all of the evidence -- not just that supporting the case for the prosecution -- in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge is required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Id.* at 133-34; *Garrett v. State*, 549 So. 2d 1325, 1331 (Miss. 1989). This standard of review is applicable to capital cases also. *Mackbee v. State*, 575 So. 2d 16, 36 (Miss. 1990). In circumstantial evidence cases, the State is required to prove the defendant's guilt not only beyond a reasonable doubt but to the exclusion of every reasonable hypothesis consistent with innocence. *Fisher v. State*, 481 So. 2d 203, 212 (Miss. 1985). However, circumstantial evidence need not exclude every "possible doubt" but only every other "reasonable" hypothesis of innocence. *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981). Each case must be determined from the circumstances shown in the testimony and the facts must consistently point to but one conclusion -- guilt. *Hester v. State*, 463 So. 2d 1087, 1091 (Miss. 1985) (quoting *Sanders v. State*, 286 So. 2d 825, 828 (Miss. 1973)).

¶143. The circumstances in this case consistently point to Brewer's guilt. Brewer was the last person seen with Christine while she was alive. He had at least forty minutes in which to sexually assault the child. It cannot be disputed that the child was sexually battered by a man as there was semen found in her vaginal vault. On the morning of May 3 Brewer got up and walked around the daylight-filled room twice and somehow missed the fact that the child was not on the blanket. Yet when the mother got up shortly after Brewer, she immediately noticed that her daughter was missing.

¶144. Then there is the bite mark evidence. Dr. West testified that of the nineteen bite marks on the child's body five were very good and indicated within a reasonable degree of medical certainty that Brewer put them there. The photographs of the doctor's direct comparison test buttress his opinion. Brewer's teeth contained several unique characteristics that are evident in the photos. For example, State's Exhibits 33-16 through 33-22 show the comparison of Brewer's dental impression with a wound on the child's thumb. The photographs clearly show Brewer's gap, which is also consistent with the gap in the wound on the child's thumb. Also, State's Exhibits 33-5, 6, 8 through 15 capture the comparison of Brewer's teeth to a wound on the child's foot. There is a chip in one of Brewer's front teeth. The unique mark made by this chipped tooth matches the wound pattern on the child's foot. Additionally, the curve or arch of the wound patterns on the child's body are identical to Brewer's upper teeth arch as illustrated in any number of the photographs.

¶145. The evidence in this case, albeit circumstantial, sufficiently supported the jury's verdict. That evidence pointed to but one conclusion -- that Brewer committed capital murder of Christine Jackson while engaged in the crime of sexual battery. His insufficiency of the evidence claim therefore fails.

## XIII.

## AGGREGATE ERROR MANDATING REVERSAL

¶146. In his final assignment of error, Brewer argues that the aggregate error in this case necessitates reversal of his conviction and sentence of death. The State responds the record is devoid of any error and thus that Brewer's conviction and sentence should be upheld.

¶147. "'Where there is no reversible error in any part, .... there is no reversible error to the whole.'" *Doss v. State*, No. 709 So. 2d 369, 401 (Miss. 1996) (quoting *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987)), *reh'g denied*, 703 So. 2d 864 (Miss. 1997).

¶148. After a careful review of the record evidence and the arguments, this Court finds only one instance of error -- the *sua sponte* exclusion of the videotape showing Dr. West's comparison of the wounds on the child's body and Brewer's dental model. Although it was error to exclude a tape that both parties wanted to use, this error was harmless beyond a reasonable doubt in light of its inculpatory nature and the fact that the still black and white photographs showed the same evidence depicted on the tape. The exclusion of the tape was not reversible, and no other error exists. Thus, no cumulative or aggregate error is shown necessitating a reversal. *Id.*

## XIV.

¶149. Miss. Code Ann. § 99-19-105(3) (1994) mandates that this Court also consider the following issues in death penalty cases:

**I. WHETHER THE SENTENCE OF DEATH WAS IMPOSED UNDER THE INFLUENCE OF PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTOR.**

**II. WHETHER THE EVIDENCE SUPPORTS THE JURY'S OR JUDGE'S FINDING OF A STATUTORY AGGRAVATING CIRCUMSTANCE AS ENUMERATED IN SECTION 99-19-101.**

**III. WHETHER THE SENTENCE OF DEATH IS EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, CONSIDERING BOTH THE CRIME AND THE DEFENDANT.**

¶150. Upon careful review of the record, we find no evidence which suggests that the jury's sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. The State reintroduced the evidence presented during the guilt - innocence phase of trial. That evidence included testimony showing that a three-year-old child had been raped and subsequently strangled by Brewer. In arriving at its verdict of death, the jury found two aggravating factors: that the capital murder occurred during the commission of sexual battery and that it was "especially heinous, atrocious and cruel." The record evidence supports both findings beyond a reasonable doubt as the instant capital offense was accompanied by such additional acts as to set the crime apart from the norm of capital felonies, i.e., "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *See Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979) (adopting the construction found in *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir.1978) in placing a limiting construction on "especially heinous, atrocious or cruel").

¶151. In particular, the evidence established that *three-year-old* Christine was not only murdered but, before her killing, was raped in such a manner that her vaginal vault was severely ripped and that she

was savagely bitten many times on various parts of her body including her face, foot, thigh, finger and ankle -- all of which clearly suggests the child experienced extreme mental and physical pain and torture preceding her death. Additionally, the sexual battery and murder of the child was perpetrated by her mother's boyfriend of three years, a fact which supports a finding of conscienceless.

¶152. The evidence clearly supported the jury's finding that the capital murder was committed during the commission of the crime of sexual battery. The State reintroduced the testimony of Dr. Steven Hayne who testified that the three-year-old child had been brutally raped shortly before she was strangled. The evidence also supported a finding that the crime was "especially heinous, atrocious or cruel" as discussed above. Thus, the record supports the conclusion that the verdict of death was in fact based on permissible factors and was not arrived at under the influence of passion, prejudice or any other arbitrary factor.

¶153. Finally, the sentence of death in this instance is not excessive or disproportionate to the penalty imposed in similar cases decided by this Court since *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976). In *Gray v. State*, 375 So. 2d 994 (Miss. 1979), this Court upheld a sentence of death where the defendant kidnapped, molested and murdered a three-year-old child. Then there is the case of *Evans v. State*, Nos. 93-DP-01173-SCT, 94-CA-00176-SCT, 1997 WL 562044 (Miss. Sept. 11, 1997) to which the instant case is quite analogous.

¶154. There, the defendant befriended the family of a ten-year-old girl and took the child away from her family under the pretext of buying groceries for them after which he vaginally and anally sexually assaulted the child before strangling her. Evans then dumped the child's body in the woods. This Court affirmed the imposition of death there, finding that death was neither excessive nor disproportionate when considering similar cases and citing *Woodward v. State*, 533 So. 2d 418 (Miss. 1988), *cert. denied*, 490 U.S. 1028 (1989), *reh'g denied*, 490 U.S. 1117 (1989), vacated in part on other grounds, 635 So.2d 805 (Miss.1993). Furthermore in *Chase v. State*, 645 So. 2d 829 (Miss. 1994), *cert. denied*, 515 U.S. 1123 (1995), this Court found no impropriety in affirming that defendant's sentence of death who was twenty years old at the time the offense of capital murder was committed. Here, Brewer was twenty-two years old when he raped and killed the three-year-old child.

¶155. It is this Court's conclusion that the sentence of death imposed on Brewer is consistent and evenhanded to like and similar cases.

## XV.

¶156. Finding no error in the trial of this matter which necessitates a reversal or any other ground upon which Brewer is entitled to relief from the conviction or the sentence of death by lethal injection, we affirm.

¶157. **CONVICTION OF CAPITAL MURDER WHILE ENGAGED IN THE COMMISSION OF SEXUAL BATTERY AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN., SECTION 99-19-105(7) (1972) AND M.R.A.P. 41(A).**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., McRAE, ROBERTS, SMITH, MILLS**

**AND WALLER, JJ., CONCUR.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

#### (continued)

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).


# DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

### FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).


# DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

### ON SENTENCING PHASE ONLY

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

***Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

**DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

**(continued)**

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* **Wiley v. Mississippi**, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Brewer is the father of Keithshawn and Nicole. Christine and Jackson's oldest child, five-year-old Christopher who was living nearby with his grandmother, have different fathers.

2. The landlord had forbidden Brewer from being on the premises.

3. Jackson testified at Brewer's trial that she told an officer about Brewer's statement; h owever she could not remember which officer she told.

4. During a recess, the State informed the trial court that it wished to introduce a color videotape into evidence which showed Dr. West performing his examination of the child's body. The State did not, however, want the audio portion of the tape played. The defense also wanted the tape introduced in its entirety. The judge watched the tape and concluded that it would not be admitted as it was "particularly gruesome and macabre." The court further noted that the doctors and assistants on the tape were "rather callous and carrying on conversations unrelated to this particular case." Moreover, there was background music from a radio playing that was not appropriate. Thus, the trial court concluded that the tape should not be introduced in evidence as the State informed the court there was nothing in the tape that would be used by West to form any additional opinions since he performed the actual examination. Furthermore, the trial court found that the prejudicial effect of the tape outweighed its relevance.

5. The State avers only eighty-two days were on the clock. By our calculations, there were eighty-four.

6. 84 + 99 = 183.

7. 183 + 9 = 192.

8. Currently URCCC 9.04, to which we will refer.

9. Brewer's *Batson* challenge effectively preserved this issue for appellate review. The cases relied upon by the State dealt with situations in which the defendants failed to raise any objection to the jury until after conviction, *Jones*, 517 So. 2d at 1310-11, or after the jury had been selected and seated, *Pickett*, 443 So. 2d at 799.

10. The second strike was to a member of the white race, as was the State's eighth and tenth challenge. The proffered reasons for these strikes will not be discussed.

11. The record and briefs do not contain information regarding the racial composition of the venire or jury. However based upon the discussion of both parties during jury selection, we were able to conclude that some blacks sat on the jury.

12. West was suspended for a year and was scheduled to resume his membership in that organization less than two months after the trial of this matter.

13. The videotape in question was thoroughly reviewed to determine if, in fact, there was gross manipulation of the dental impression or the child's cadaver in order to match a bite mark. Dr. West explained during his testimony that some twisting of the body is necessary because a bite inflicted upon a living being would cause the skin to flex and bunch. Based upon our review of the videotape, we conclude the tape does not demonstrate manipulation to such a degree that the technique or match is called into question. If anything, the videotape is quite damaging to Brewer's innocence defense.

14. It appears from the record that the child's body was found May 5, two days after Brewer was arrested, based upon charting the witnesses' testimony concerning a two-day search. However, the record is lacking in specific dates for a number of events, including taking statements from Brewer and when exactly he submitted a dental impression. The reported dates are based upon a careful attempt to piece together the facts from several witnesses' testimony -- although they were not certain about particular dates.

15. According to the trial testimony, they searched for the child for two days, finding her on the 5th. However during the suppression hearing, Permenter stated that he took Brewer's statement on May 4, and he previously stated that he did not take a statement from Brewer until the child's body was found. Thus, the record is unclear as to what date exactly the child's body was found or Brewer's initial statement was taken.

16. The record does not indicate whether the dental impression was obtained prior to Brewer's initial appearance.

17. Eichelberger admitted that Brewer did not initiate the request to give a dental impression and that his attorney was not notified about the dental impression. The record indicates that Brewer's trial attorney was appointed on May 12, 1992.